ROBERTSON FACTORIES, INC., AS ROBERTSON FACTORIES, INCORPORATED, AS THE ROBERTSON FACTORIES, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 46318. Filed February 27, 1959.

*Allison A. Gould, Esq.*, for the petitioner.
*Emil Sebetic, Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has determined that petitioner is entitled to no relief under section 722 of the Internal Revenue Code of 1939 in respect of its excess profits taxes for the taxable years 1941, 1942, and 1943, and has further determined a deficiency in the amount of $7,587.14 in petitioner's excess profits taxes for the taxable year 1943. The foregoing deficiency arises out of the denial of relief for 1943 and is not independently in issue.

FINDINGS OF FACT.

Petitioner is a Connecticut corporation organized in 1927 and having its "Home Office" in New York City. At all times material it maintained its books and records and filed its Federal tax returns on a calendar year basis and pursuant to an accrual method of accounting.

Petitioner filed corporation income and declared value excess-profits returns on Forms 1120 and corporation excess profits returns on Forms 1121 for 1941 to 1943, inclusive, with the then collector of internal revenue at Hartford, Connecticut. It paid excess profits taxes as follows:

| Year | Amount | Date of payment | Amount of payment |
|---|---|---|---|
| 1941 | $21,211.48 | Mar. 15, 1942 | $5,505.78 |
| | | June 15, 1942 | 5,371.97 |
| | | Sept. 15, 1942 | 5,371.97 |
| | | Dec. 15, 1942 | 5,371.98 |
| | | Apr. 22, 1944 [2] | (410.22) |
| 1942 | 154,019.15 | Mar. 15, 1943 | 41,400.00 |
| | | June 15, 1943 | 36,959.79 |
| | | Sept. 15, 1943 | 39,179.90 |
| | | Dec. 15, 1943 | 39,179.89 |
| | | Apr. 28, 1945 [2] | (2,466.50) |
| | | Aug. 7, 1950 [2] | (233.94) |
| 1943 | [1] 283,864.76 | Mar. 14, 1944 | 75,000.00 |
| | | June 15, 1944 | 70,665.56 |
| | | Sept. 14, 1944 | 70,737.56 |
| | | Dec. 15, 1944 | 70,593.55 |
| | | Apr. 15, 1947 [2] | (2,700.00) |
| | | Feb. 24, 1948 [2] | (431.91) |

[1] Excess profits tax liability as finally determined by the Commissioner of Internal Revenue__ $291,451.90
Less: Deferment under section 710(a)(5)_____ 7,587.14

283,864.76

[2] Overassessment scheduled.

Agreements were executed extending to June 30, 1949, the period of limitation governing the assessment and collection of taxes for 1943. Petitioner filed applications for relief under section 722 on Forms 991, seeking a constructive average base period net income and claiming refunds of excess profits taxes paid, as follows:

| Year | Date filed | CABPNI claimed | Refund claimed |
|---|---|---|---|
| 1941 (Original) | Sept. 16, 1943 | $105,072 | $21,621.70 |
| (Amended) | Jan. 29, 1944 | 104,750 | 21,621.70 |
| (2nd Amended) | Dec. 12, 1945 | 112,688 | 21,211.48 |
| 1942 (Original) | Sept. 16, 1943 | 105,072 | 135,377.08 |
| (Amended) | Jan. 29, 1944 | 104,750 | 137,559.05 |
| (2nd Amended) | Dec. 12, 1945 | 112,688 | 154,253.09 |
| 1943 (Original) | Aug. 21, 1944 | 104,750 | 39,504.62 |
| (Amended) | Dec. 12, 1945 | 112,688 | 46,291.61 |

A further amended application was filed June 14, 1949, in the form of a typewritten statement with schedules attached, in respect of the taxable years in controversy.

Petitioner's excess profits net income and excess profits credits computed under the invested capital method, specific exemption, adjusted excess profits net income without the benefit of section 722, and its excess profits net income computed under the income credit method without the benefit of section 722 for 1940 to 1943, inclusive, were as follows:

| Year | Excess profits net income [1] | Excess profits credit [1] | Specific exemption | Adjusted excess profits net income | Excess profits net income [2] |
|---|---|---|---|---|---|
| 1940 | [3] $24,603.51 | $21,498.51 | $5,000 | 0 | $24,012.96 |
| 1941 | 81,513.38 | 21,598.97 | 5,000 | $54,914.41 | 80,764.49 |
| 1942 | 213,444.28 | 36,941.20 | 5,000 | 171,503.08 | 209,713.03 |
| 1943 | 429,256.75 | 42,809.42 | 5,000 | 381,447.33 | 425,856.33 |

[1] As computed under the invested capital method.
[2] As computed under the income credit method.
[3] Before deduction of income tax in the amount of $3,967.92.

During the years 1936 to 1941, inclusive, petitioner manufactured curtains, drapes, and related products in factories at the following locations:

Cincinnati, Ohio
Cleveland, Ohio
Detroit, Michigan
Los Angeles, California
Pittsburgh, Pennsylvania
Portland, Oregon
San Francisco, California
Taunton, Massachusetts
St. Paul, Minnesota (Twin Cities)

Petitioner's sales (after deduction of returns and allowances) and net income for 1927 to 1943, inclusive, were as follows:

| Year | Sales | Net income (or loss) | Year | Sales | Net income (or loss) |
|---|---|---|---|---|---|
| 1927 | $203,543 | $12,389 | 1936 | $1,186,924 | $12,403 |
| 1928 | 417,805 | 31,658 | 1937 | 1,068,661 | (14,934) |
| 1929 | 1,166,820 | 17,354 | 1938 | 1,043,082 | 4,149 |
| 1930 | 852,777 | (31,831) | 1939 | 1,321,396 | 15,758 |
| 1931 | 934,343 | (51,547) | 1940 | 1,521,022 | 24,012 |
| 1932 | 486,241 | (49,529) | 1941 | 1,931,262 | 81,863 |
| 1933 | 598,700 | 19,809 | 1942 | 3,858,076 | 209,713 |
| 1934 | 723,917 | 23,958 | 1943 | 4,446,690 | 426,819 |
| 1935 | 956,512 | 12,556 | | | |

For 1936 to 1939, inclusive, petitioner's profit (loss) as reported by its factories (prior to elimination of markups on shipments from the home office and prior to year-end adjustments) on a monthly or bimonthly basis was as follows:

Exhibit No. 5-E

## THE ROBERTSON FACTORIES, INCORPORATED—DOCKET No. 46318

Comparative Profit or (Loss) by Factories on a Monthly or Bi-Monthly Basis before elimination of the Mark-ups on Shipments of Materials to the Factories from the Home Office, and before Year End Adjustments

### Factories Profit or (Loss)

| Year & Month | Cincinnati | Cleveland | Detroit | Los Angeles Embroidery | Los Angeles Curtains | Pittsburgh[h] | Portland | San Francisco | Twin Cities (St. Paul) | Taunton |
|---|---|---|---|---|---|---|---|---|---|---|
| **1936** | | | | | | | | | | |
| January | $109.25 | $(761.20) | $(323.16) | $(962.74) | $(122.21) | $133.68 | $(258.97) | $(287.62) | $(592.63) | $(1,699.23) |
| February | 401.72 | (562.47) | (498.29) | (547.08) | (108.35) | (294.05) | (146.60) | (884.71) | (75.90) | |
| March | 1,651.07 | (222.25) | 278.63 | (828.72) | (855.34) | (109.62) | 1,179.99 | 144.66 | 1,027.86 | (2,072.16) |
| April | | 161.98 | (634.74) | (123.22) | (1,387.48) | 194.57 | | (377.26) | | |
| May | 631.48 | (2,093.51) | (1,627.34) | (118.77) | 151.60 | (806.06) | (707.77) | 452.58 | 830.21 | (3,491.41) |
| June | | | | | | | | | | |
| July | 257.84 | (20.23) | 42.25 | (234.05) | 30.60 | (99.69) | (917.28) | (196.64) | 155.67 | (4,714.78) |
| August | | | | | | | | | | |
| September | 1,491.65 | (1,146.18) | (145.03) | (68.05) | 447.16 | (911.78) | 344.04 | 1,485.85 | 1,880.53 | 531.83 |
| October | | | | | | | | | | |
| November | 1,148.67 | (868.32) | (682.26) | (19.67) | (1,040.41) | 404.58 | 418.29 | 857.73 | (535.88) | (4,760.11) |
| December | | | | | | | | | | |
| Total Net Profit (Loss) | $5,691.68 | $(5,502.18) | $(3,589.94) | $(2,903.30) | $(2,894.43) | $(1,488.33) | $(88.30) | $1,164.59 | $2,689.91 | $(16,205.86) |
| **1937** | | | | | | | | | | |
| January | $79.66 | $(1,122.22) | $357.97 | | $(436.30) | $1,798.69 | $663.17 | $258.07 | $1,631.94 | $(975.36) |
| February | | 400.78 | 456.77 | | | | | | | |
| March | 1,311.28 | 536.50 | (1,118.33) | | 88.98 | 488.77 | 905.71 | 977.37 | 2,118.76 | (916.70) |
| April | | (1,082.85) | (1,186.43) | $(18.57) | | | | | | |
| May | (61.76) | (1,047.37) | (1,238.79) | | (1,564.40) | 157.07 | (220.17) | (602.95) | (725.85) | (2,966.63) |
| June | | | | | | | | | | |
| July | (1,186.49) | (1,833.74) | (511.21) | | (460.93) | (1,828.75) | 322.75 | 127.93 | (1,073.50) | (5,457.30) |
| August | | | | | | | | | | |
| September | (387.18) | (968.65) | (822.95) | | (1,465.18) | 121.49 | (486.37) | 1,071.05 | (303.95) | (3,584.70) |
| October | | | | | | | | | | |
| November | (1,368.29) | (1,420.45) | (1,680.17) | | (2,294.53) | (2,529.18) | (988.69) | (433.87) | (2,458.04) | (3,777.58) |
| December | | (1,010.63) | | | | | | | | |
| Total Net Profit (Loss) | $(1,592.78) | $(7,548.63) | $(5,743.14) | $(18.57) | $(6,132.36) | $(1,791.91) | $225.10 | $1,397.60 | $(810.65) | $(17,678.27) |

Exhibit No. 5-E—Continued

## THE ROBERTSON FACTORIES, INCORPORATED—DOCKET No. 46318

Comparative Profit or (Loss) by Factories on a Monthly or Bi-Monthly Basis before elimination of the Mark-ups on Shipments of Materials to the Factories from the Home Office, and before Year End Adjustments

### Factories Profit or (Loss)

| Year & Month | Cincinnati | Cleveland | Detroit | Los Angeles | | Pittsburg[h] | Portland | San Francisco | Twin Cities (St. Paul) | Taunton |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Embroidery | Curtains | | | | | |
| *1938* | | | | | | | | | | |
| January | $460.85 | $(1,365.16) | $(773.25) | $ | $(344.11) | $(1,987.29) | $(860.74) | $(238.98) | $(1,569.71) | $(1,273.61) |
| March | 1,781.10 | (135.00) | (537.92) | | (13.47) | (398.53) | 84.49 | 959.32 | (227.41) | (995.24) |
| May | (64.71) | (854.05) | (393.32) | | (724.53) | 61.44 | (181.27) | (305.47) | (958.31) | (1,307.04) |
| July | (752.50) | (629.63) | (532.69) | | (477.35) | (546.54) | (1,114.75) | (83.99) | (919.49) | (2,605.33) |
| September | 716.25 | 163.46 | 209.45 | | (1,758.41) | 7.15 | 75.72 | 354.15 | 23.26 | 1,256.74 |
| November | 95.99 | (637.40) | (368.82) | | (1,108.58) | (74.87) | (935.86) | 369.35 | (1,066.03) | 974.27 |
| Total Net Profit (Loss) | $1,315.28 | $(3,457.78) | $(2,896.55) | | $(4,421.45) | $(2,933.64) | $(2,932.41) | $1,009.38 | $(4,717.69) | $(3,950.21) |
| *1939* | | | | | | | | | | |
| January | $(453.13) | $(970.48) | $321.30 | $ | $(960.77) | $13.20 | $(743.91) | $201.94 | $(1,292.78) | $(415.49) |
| March | 1,668.45 | (655.92) | 387.99 | | (2,087.41) | 512.11 | (970.66) | (185.10) | (705.25) | (1,797.57) |
| May | 364.38 | 316.55 | (110.75) | | (2,650.07) | 524.10 | (219.85) | (1,092.80) | (765.23) | 762.77 |
| July | (881.06) | (1,697.53) | (466.53) | | (2,809.45) | (230.38) | (37.32) | 379.06 | (442.72) | 1,208.42 |
| September | 208.35 | 461.46 | 943.58 | | (686.17) | 217.27 | (1,018.74) | 210.42 | 2,259.47 | 188.60 |
| November | (312.15) | 908.53 | 251.85 | | (1,602.30) | 304.33 | 166.09 | 708.58 | (639.87) | 6,779.03 |
| Total Net Profit (Loss) | $594.84 | $(1,637.39) | $1,327.44 | | $(10,796.17) | $1,340.63 | $(2,824.39) | $222.10 | $(1,286.38) | $6,725.76 |

Donald Randall had managed petitioner's Los Angeles factory since prior to 1933. He died in January of 1936. The net profits (loss) of the Los Angeles factory from 1933 to 1941, inclusive, were as follows:

| Year | Profits (loss)[1] | Year | Profits (loss)[1] |
|------|------------------|------|------------------|
| 1933 | $4. 56 | 1938 | ($1,166. 10) |
| 1934 | (4,278. 72) | 1939 | (7,124. 13) |
| 1935 | (13,292. 46) | 1940 | (4,259. 14) |
| 1936 | 294. 51 | 1941 | 2,007. 54 |
| 1937 | (3,162. 95) | | |

[1] These figures are derived from statements prepared by outside auditors. A similar schedule covering 1936 to 1939, inclusive, and introduced as joint exhibit 5–E, *supra,* shows a net loss for 1936 and greater losses than are shown above for 1937, 1938, and 1939.

In addition, a unit designated "Los Angeles Embroidery" had the following net profits (loss) for 1936 to 1940, inclusive:

| Year | Profits (loss) |
|------|----------------|
| 1936 | ([1] $2,193. 07) |
| 1937 | ([1] 438. 26) |
| 1938 | ([1] 35. 58) |
| 1939 | ([1] 53. 45) |
| 1940 | 45. 30 |

[1] Exhibit 5–E, *supra,* shows no results from this unit after April 1937.

During March 1936 floods occurred on the Ohio, Allegheny, Monongahela, and Susquehanna Rivers, killing 171 persons and making 430,000 persons homeless in and around Pittsburgh, Altoona, and Wilkes-Barre, Pennsylvania, and Wheeling, West Virginia. As a result of the flood, which reached the second floor, production at petitioner's Pittsburgh plant was disrupted for between 4 and 6 months. A considerable amount of cloth and curtains was lost by damage, and the flood adversely affected many of petitioner's retail customers in that area.

The net sales and net profits (loss) of the Pittsburgh factory for 1936 to 1941, inclusive, were as follows:[1]

| Year | Net sales | Profits (loss) |
|------|-----------|----------------|
| 1936 | $119,082. 86 | $1,345. 90 |
| 1937 | 122,023. 15 | (278. 09) |
| 1938 | 94,489. 10 | (1,182. 38) |
| 1939 | 100,395. 37 | 2,039. 09 |
| 1940 | 107,150. 26 | 1,762. 12 |
| 1941 | 122,815. 38 | 1,935. 09 |

In 1935, the operations of the Pittsburgh plant resulted in a net profit in the amount of $297.01.

From approximately 1936 to 1938, certain practices by other manufacturers in an area centering around Fall River, Massachusetts,

[1] As prepared by outside auditors. The profit or loss figures for all factories, including the Pittsburgh plant, on a monthly or bimonthly basis for 1936 to 1939, inclusive, according to a different schedule, have already been set forth previously—see exhibit 5–E, *supra.*

proved economically injurious to petitioner's Taunton factory. Among such practices was the hiring of persons as "learners" at substandard wages. Petitioner's Taunton unit had to reduce prices drastically to meet competition. During this period a number of bankruptcies occurred in the area.

To the extent shown, the ownership of petitioner's common stock was as follows:

| Date | Certificate # | | Total Number of Shares | |
|---|---|---|---|---|
| | 101 | Void | | |
| 2/ 7/27 | 102 | C. Stuart Robertson | | 1120 |
| | 103 | C. Stuart Robertson | | 880 |
| | | | | 2000 |
| 12/31/28 | 101 | C. Stuart Robertson | | 1120 |
| | 104 | Howard L. White | | 40 |
| | 105 | Charles F. Wing, Jr. | | 40 |
| | 106 | Earnest A. Jennings | | 40 |
| | 107 | Florence C. Jennings | | 20 |
| | 108 | Sarah A. Jennings | | 20 |
| | 109 | Roger M. Jennings | | 20 |
| | 110 | C. Stuart Robertson | | 300 |
| | 111 | C. Stuart Robertson | | 320 |
| | 112 | Charles F. Wing, Jr. | | 20 |
| | 113 | C. Stuart Robertson | | 60 |
| | | | | 2000 |
| 2/15/29 | 114 | Morse, Driscoll, Hunt Co. Inc. | | 2000 |
| 1/26/33 | 116 | C. Stuart Robertson | 320 | |
| | 119 | C. Stuart Robertson | 589 | 909 |
| | 121 | Joseph K. Milliken | | 1090 |
| | 122 | Mark M. Horblit | | 1 |
| | | | Total | 2000 |
| 7/22/33 | 116 | C. Stuart Robertson | 320 | |
| | 119 | C. Stuart Robertson | 589 | |
| | 126 | C. Stuart Robertson | 300 | |
| | 127 | C. Stuart Robertson | 489 | |
| | 130 | C. Stuart Robertson | 298 | 1996 |
| | 123 | Mrs. C. S. Robertson | | 1 |
| | 124 | C. J. Robertson | | 1 |
| | 128 | Joseph K. Milliken | | 1 |
| | 129 | Mark M. Horblit | | 1 |
| | | | Total | 2000 |

| Date | Certificate # | | Total Number of Shares | |
|---|---|---|---|---|
| 3/23/34 | 116 | C. Stuart Robertson | 320 | |
| | 119 | C. Stuart Robertson | 589 | |
| | 126 | C. Stuart Robertson | 300 | |
| | 127 | C. Stuart Robertson | 489 | |
| | 133 | C. Stuart Robertson | 278 | 1976 |
| | 123 | Mrs. C. S. Robertson | 1 | |
| | 131 | E. S. Robertson | 10 | 11 |
| | 124 | C. J. Robertson | 1 | |
| | 132 | C. J. Robertson | 10 | 11 |
| | 128 | Joseph K. Milliken | 1 | |
| | 129 | Mark M. Horblit | 1 | 2 |
| | | | Total | 2000 |
| 1/18/37 | 116 | C. Stuart Robertson | 320 | |
| | 119 | C. Stuart Robertson | 589 | |
| | 126 | C. Stuart Robertson | 300 | |
| | 127 | C. Stuart Robertson | 489 | |
| | 133 | C. Stuart Robertson | 278 | 1976 |
| | 123 | Mrs. C. S. Robertson | 1 | |
| | 131 | E. S. Robertson | 10 | 11 |
| | 124 | C. J. Robertson | 1 | |
| | 132 | C. J. Robertson | 10 | 11 |
| | 129 | Mark M. Horblit | | 1 |
| | 134 | J. D. Robertson | | 1 |
| | | | Total | 2000 |
| 2/15/39 | 116 | C. Stuart Robertson | 320 | |
| | 119 | C. Stuart Robertson | 589 | |
| | 126 | C. Stuart Robertson | 300 | |
| | 127 | C. Stuart Robertson | 489 | |
| | 133 | C. Stuart Robertson | 278 | |
| | 135 | C. Stuart Robertson | 1 | 1977 |
| | 123 | Mrs. C. S. Robertson | 1 | |
| | 131 | E. S. Robertson | 10 | 11 |
| | 124 | C. J. Robertson | 1 | |
| | 132 | C. J. Robertson | 10 | 11 |
| | 134 | J. D. Robertson | | 1 |
| | | | Total | 2000 |

From and after July 22, 1933, C. Stuart Robertson was petitioner's president and dominant stockholder. He was also its general manager and a member of its board of directors.

Petitioner's policy has been to try to utilize all new types of fabrics. When it began business in 1923, only 3 fabrics, all cottons, were available. By 1939, petitioner was using about 12 different cotton and 3 rayon fabrics. Petitioner began using rayon in the manufacture of curtains in about 1934 or 1935, but a number of technical difficulties had not yet been overcome, and the first rayon curtains it produced were of extremely poor quality.

On the dates indicated, petitioner's borrowed capital, nonborrowed capital, total capital, and the ratio of nonborrowed to total capital were as follows:

| Date | Borrowed capital [1] | Nonborrowed capital [2] | Total | Ratio of nonborrowed to total capital |
|---|---|---|---|---|
| Jan. 1, 1936 | $30,000 | $162,850.75 | $192,850.75 | 84.8 |
| Dec. 31, 1936 | 55,000 | 176,101.36 | 231,101.36 | 70.6 |
| Dec. 31, 1937 | 39,500 | 260,311.04 | 299,811.04 | 86.8 |
| Dec. 31, 1938 | 0 | 259,562.45 | 259,562.45 | 100.0 |
| Dec. 31, 1939 | 50,000 | 253,449.78 | 303,449.78 | 83.5 |

[1] Consisting of notes payable.
[2] The sum of capital stock, paid-in or capital surplus, and earned surplus and undivided profits.

## OPINION.

In this case there has occurred massive failure of proof. Petitioner's many claims being only asserted, we must and do enter our judgment for respondent.

We had first thought to initiate and conclude our opinion with the above statement, and perhaps it is a better opinion than that which follows, but we proceed because of an impression at the trial of this case that petitioner's claim of change of character because of a new product might be meritorious.

We have proceeded to do what petitioner apparently was not willing to do for itself—we have double-combed the record searching for facts upon which qualification and reconstruction could be founded—fruitlessly.

To summarize petitioner's conduct of its case, every imaginable claim under section 722 (a) and (b) was here asserted,[1] none was

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such con-

ever abandoned despite poverty of proof, petitioner's witnesses testified largely to ultimate conclusions rather than facts, proposed findings on brief included many unsupported conclusions, sweeping generalities and quoted statutory language and there were practically no record references. Perhaps petitioner's omission of record references was deliberate, considering our unrewarding search. If so, we do not recommend such methods.

Our observation made in *Producers Crop Improvement Association*, 7 T.C. 562, at 565, is appropriate in this case:

It behooves counsel for a petitioner to state his case at least so that it can be understood, and to prove and call attention to sufficient facts to support his theory. He may not safely rely upon the Tax Court to dig out and develop a case for him. That is not the function of the Court, and it does not have the time or the facilities to do the work of counsel. Furthermore, it would not be fair to the Commissioner if the Court surprised him by developing in its opinion a case against the Commissioner which he had no way of anticipating or contesting. This is not to say that the Court is indifferent to the results reached or that it would not turn its hand to do justice where it could properly assist one party or the other to that desirable end. The point is that the parties have the primary duty of presenting their cases, and they can not shift that duty to

structive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. * * *

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer,

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

(3) the business of the taxpayer was depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to

(A) a profits cycle differing materially in length and amplitude from the general business cycle, or

(B) sporadic and intermittent periods of high production and profits, and such periods are inadequately represented in the base period,

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. * * *

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period * * *

the Commissioner or complain if the Court does not exceed its proper function to make up for counsel's shortcomings.

We shall treat first of petitioner's claims under section 722(b)(4) because petitioner's only claim of colorable merit, i.e., change of character or operation because of the introduction of a new product during the base period, is made under that section.

## Section 722(b)(4).

Petitioner claims relief for 1941, 1942, and 1943 under section 722(b)(4) claiming (1) changes in operation or management, (2) a difference in the products furnished, (3) a difference in the capacity for production or operation, and (4) a difference in the ratio of non-borrowed capital to total capital; and all claimed to have occurred immediately prior to or during the base period.

In order to qualify for relief under this section petitioner must demonstrate (1) that there occurred during or immediately prior to the base period at least one such change in the character of its business, and (2) that *as a direct result* of such change or changes there were increased earnings. Cf. *Granite Construction Co.*, 19 T.C. 163, 171–172.

1. In view of the above requirements the various changes of stockholders, directors, and factory managers relied on in support of the asserted changes in the operation or management, cannot aid petitioner. Mere changes alone are insufficient, and aside from unsupported conclusions from the witness stand on the part of petitioner's president and dominant stockholder and similar unsupported arguments on brief there is nothing to indicate that such changes basically affected petitioner's direction and policies and eventually caused, or even could have caused, improved earnings. Cf. *Toledo Stove & Range Co.*, 16 T.C. 1125, 1133.

2. The theory of a new product is subject to serious question as to whether the product was "new" within the intendment of the statute.

In *Triangle Raincoat Co.*, 19 T.C. 548, the taxpayer had originally manufactured and sold approximately 90 different styles of raincoats containing no wool. During 1937, it, for the first time, added woolen fabrics to its raincoat line both in the form of liners, so that the raincoats were reversable, and by waterproofing the woolens. In holding that such a change or addition did not qualify petitioner under section 722(b)(4) we said (p. 565):

The line of woolen merchandise fitted in with and supplemented petitioner's line of raincoats * * * The manufacture of outer garments from waterproofed woolens was not essentially different from the manufacture of outer garments from other waterproofed fabrics. * * *

See also *Avey Drilling Machine Co.*, 16 T.C. 1281; *Stonhard Co.*, 13 T.C. 790,

Assuming, *arguendo*, that the introduction of rayon curtains constituted the furnishing of a "new" product within the meaning of section 722(b)(4), we must still deny any relief based upon such change, because the record fails to show that this innovation was to any extent responsible for the increased earnings enjoyed by petitioner. Petitioner bears the burden of proving a causal relationship, and we may not assume from the bare fact that earnings rose that this was in whole or in part a result of the introduction of rayon curtains.

The record fails to establish that the profit margin on rayon products exceeded that enjoyed on sales of cotton goods. Nor are we convinced from the proof that sales of rayon curtains were made to customers who would not otherwise have purchased cotton curtains from petitioner in similar quantities.

Petitioner's attempted proof of its excessive profit margin on, and to be expected on, rayon over cotton goods was expressed as a table on brief:

| Year | Rayon goods profit margin | Cotton goods profit margin |
|------|---------------------------|----------------------------|
| 1936 | 13. 0 | 14. 4 |
| 1937 | 12. 4 | 11. 1 |
| 1938 | 10. 6 | 12. 1 |
| 1939 | 27. 5 | 1. 9 |

Aside from being singularly unconvincing, the table is unacceptable because the elements and facts behind the percentage figures are largely unsupported by evidence and one allocation of costs, as between rayon and cotton, was entirely arbitrary insofar as proof is concerned.

3. Petitioner's continued assertion of an increase in its capacity for production or operation is difficult to understand, in view of the total absence from the record of evidence to support this position.

Petitioner claims it added special machinery and equipment, but this cannot be established by merely noting on brief, as petitioner does, small overall increases in its depreciation account.[2] Petitioner states on brief that a relatively small investment in sewing machines greatly enhances productive capacity and that the "capacity of secondhand sewing machines * * * [is] very substantial." But these are matters of proof, and there is no evidence in the record from which we may make findings to that effect.

The same considerations apply with equal force to the alleged increases in the size of quarters occupied by a number of petitioner's factories.

4. Petitioner's fourth and last claim for relief under section 722(b) (4) is based upon an alleged change in the ratio of nonborrowed capital to total capital. In the foregoing findings of fact we have already set

---

[2] Petitioner notes that its income tax returns for 1936, 1937, and 1938 showed increases in its depreciable machinery and equipment account of $1,028.53, $1,629.36, and $5,836.33, respectively. None is noted for 1939.

forth that ratio as of various dates, including the beginning and closing dates of the base period. Those figures show that, while changes occurred from time to time, the ratio at the beginning of the base period was virtually identical with that in effect at the end of such period. And at all times the ratio was somewhere between 70 and 100 per cent.

Moreover, neither an increase in equity capital nor a decrease in borrowed capital is alone sufficient. There must be "a decrease in borrowed capital offset by a corresponding increase in equity capital." See Regs. 112, sec. 35.722–3(d)(4).

While a substantial increase in equity capital took place, it was not a "corresponding" increase, i.e., corresponding to a decrease in borrowed capital. The latter actually *increased* during the base period from $30,000 to $50,000. True, borrowed capital was eliminated at one point, but only temporarily, and reappeared in the figures for the following year.

In view of the foregoing, we cannot find that petitioner qualifies for relief under section 722(b)(4).

Turning now to petitioner's claims under the other provisions of section 722 in order:

## *Section 722(b)(1).*

Petitioner asserts as qualifying events (1) the death of Donald Randall, and (2) the Pittsburgh flood. Both events took place in 1936.

The record is devoid of evidence of the economic significance of Randall's death. He managed the Los Angeles factory during 1933, 1934, and 1935, yet at no time during that period was a substantial profit realized, and in both 1934 and 1935 the Los Angeles operations resulted in substantial losses.[3] The loss in 1935 greatly exceeded the net loss of any year after his death. And although Randall died in January of 1936, a small profit was enjoyed in that year.

A separate operation, the embroidery factory or unit, seems to have substantially ceased operations in or about April 1937.[4] There is no record evidence as to the cause of such cessation, and petitioner now asserts on brief that it was the result of Randall's death. Manifestly, this is a matter to be proven by evidence, not on brief. In any event, the available earnings records of that operation do not show its cessation to have adversely affected petitioner's average base period net income.

Although petitioner's evidence is to the effect that its operations in Pittsburgh were disrupted 4 to 6 months by virtue of the flood of

[3] Petitioner's president, C. Stuart Robertson, testified that the Los Angeles operations had been "partly" successful prior to Randall's death, and that Randall was a "very successful manager." The actual results of such operation indicate otherwise.

[4] Some conflicting evidence indicates operations thereafter, but we resolve this doubt in petitioner's favor.

March 1936, the outside auditors' figures for Pittsburgh show a net profit for 1936 and losses for 1937 and 1938. Petitioner may well have suffered adverse economic consequences as a result of that flood such as to qualify it for relief, but the record before us fails so to establish.

Petitioner has failed to demonstrate its right to relief under section 722(b)(1).

### Section 722(b)(2).

Petitioner seeks relief under this provision on the ground of an alleged "price war" affecting its Taunton factory. The manner in which the evidence respecting this event has been presented leaves us no choice but to hold that petitioner has failed to prove its case.

To qualify under section 722(b)(2) petitioner must show that (1) its business was depressed, (2) due to temporary economic circumstances (3) unusual in petitioner's experience. Cf. *Constitution Publishing Co.*, 23 T.C. 19, 28. The record is practically silent in these respects.

It is not clear what petitioner really means when it speaks of a "price war," whether that some competitors sold below cost (and if so the record is entirely silent), or that some competitors with lower costs were able to undersell petitioner and yet still reap a profit. The reference to the "learner racket" would seem to indicate the latter. Yet it is well established that mere competition, notwithstanding that it be intense, notwithstanding that it may be of questionable ethical nature, is not a qualifying factor under section 722(b)(2). Cf. *Democrat Publishing Co.*, 26 T.C. 377, 383; *Constitution Publishing Co., supra*, at 29; *Lamar Creamery Co.*, 8 T.C. 928, 939.

It is not clear to what extent petitioner claims as an event within the purview of section 722(b)(2) an alleged "price break" in the replacement cost of its raw material inventory. There is some evidence of a drop between 1937 and 1938 in the price of fabrics used by petitioner, but we are left completely in the dark as to the effect, if any, of this fact upon petitioner's profits. The mere fact of such a drop in price of raw material used by petitioner is not, in and of itself, a ground for relief, yet petitioner has attempted only the proof of that bare fact.

Petitioner is not entitled to relief under section 722(b)(2).

### Section 722(b)(3).

Petitioner's claim under this provision may be dealt with summarily. Petitioner's president testified that petitioner's business was allied to the building construction industry, but the record is devoid of evidence supporting this general conclusion. Moreover, we have in the present record no evidence of the relation of the profits cycle

of the construction industry to that of general business. Petitioner's claim to relief under section 722(b)(3) is unproved and denied.

### Section 722(b)(5).

Petitioner has never expressly abandoned its claim under any provision of section 722(b), and still asserts on brief a right to relief under section 722(b)(5). However, no facts have been alleged or proven other than those relating to other provisions of section 722(b), and already discussed, and we must, accordingly, hold that petitioner has failed to qualify for relief under section 722(b)(5). Cf. *N. Hess' Sons, Inc.*, 31 T.C. 385, 402.

### General.

We have above determined that petitioner has failed to show that it satisfies any of the provisions of section 722(b). However, even had petitioner established the applicability of one or more of such provisions, we would still have to deny it any relief.

Petitioner, to prevail under any of the relief provisions of section 722(b), must do more than merely demonstrate that the tax computed without the benefit of section 722 results in an excessive and discriminatory tax, and that as an academic proposition it qualifies for relief. It must additionally establish a fair and just amount representing normal earnings to be used as a constructive average base period net income. Cf. *East Texas Motor Freight Lines*, 7 T.C. 579, 587, 592.

Petitioner here has not shown us what would constitute a fair and just amount representing normal earnings. Its attempted reconstruction is in many respects based upon assumptions of facts not established by competent evidence, and is thus wholly unacceptable. We would be unable to find, even had petitioner shown that the tax without the benefit of section 722 was excessive and discriminatory, that it has established a fair and just amount representing normal earnings.

Furthermore, petitioner's excess profits credits have been computed under the invested capital method. As a result, it has received credits far in excess of those which would have resulted from the use of its base period net income, even taking into account the deficit rule. Accordingly, petitioner, to prevail here, would additionally have to show that it is entitled to a constructive average base period net income large enough to result in credits exceeding those available under the invested capital method. Cf. *N. Hess' Sons, Inc.*, *supra*, at 402; and *Hall Lithographing Co.*, 26 T.C. 1141, 1156, quoting *Mokry & Tesmer Machine Co.*, 23 T.C. 12, 18.

From all of the above, we hold that—

*Decision will be entered for the respondent.*

Reviewed by the Special Division.