THE NATATORIUM LAUNDRY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 32700.   Filed October 30, 1959.

*A. E. Brooks, Esq., Kenneth G. Tarlton, Esq.,* and *H. S. Lattimore, Esq.,* for the petitioner.

*Allen T. Akin, Esq.,* for the respondent.

FORRESTER, *Judge:* Petitioner challenges respondent's disallowance of its claim for relief under section 722 of the Internal Revenue Code of 1939 for the taxable years 1944 and 1945. The taxable years 1942 and 1943 are also involved by reason of claimed carryover credits.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

The petitioner is a corporation organized under the laws of the State of Texas, with its principal place of business in Fort Worth. Its Federal income and excess profits tax returns, for each of the calendar

years 1942, 1943, 1944, and 1945, were filed on an accrual and calendar year basis with the then collector of internal revenue for the second district of Texas at Dallas.

It is stipulated that petitioner's actual excess profits net income for the base period as allowed by the Commissioner was:

| Year | Amount |
|---|---|
| 1936 | $35,279.58 |
| 1937 | 17,516.62 |
| 1938 | 5,243.15 |
| 1939 | (5,750.82) |

which results in an actual average base period net income of $13,072.13. It is also stipulated that the Commissioner allowed the application of section 713 (e), I.R.C. 1939, which resulted in an average base period net income of $18,137.30 and that the use of such last-mentioned figure resulted in the following excess profits taxes:

| Year | Excess profits net income | Excess profits tax paid |
|---|---|---|
| 1942 | [1] $18,874.88 | ([2]) |
| 1943 | 24,805.94 | ([2]) |
| 1944 | 93,255.59 | $56,451.50 |
| 1945 | 105,732.26 | 67,119.06 |

[1] Without a carryover loss from 1941 of $627.15.
[2] None.

The petitioner filed timely applications for relief and claims for refund and now asks for a constructive average base period net income of $44,557.55 which it is stipulated would result in the following:

| Year | Excess profits carryover credit | Refund claimed |
|---|---|---|
| 1942 | $24,154.11 | ([1]) |
| 1943 | 18,871.73 | ([1]) |
| 1944 | ([1]) | $56,451.50 |
| 1945 | ([1]) | 21,458.42 |
| Total refund claimed | | 77,909.92 |

[1] None.

In 1915, the Johnson Linen Supply Company, which had been formed in 1909, was joined with and incorporated into the Natatorium Laundry Company. Although the towel or linen supply business was an integral part of the petitioner's total operation, it was operated as a separate business and under the trade name of Johnson Towel Supply.[1]

The petitioner entered the drycleaning business in 1931, and fur storage business in 1933. However, it was not until 1936 that the petitioner performed its drycleaning operations in its own plant.

[1] During the base period, the linen supply business of the petitioner consisted of supplying towels, tablecloths, napkins, uniforms, and other such items to various firms on a service charge basis.

In 1938, the petitioner purchased rug-cleaning machinery for $13,232.40 and entered the rug-cleaning business, which business was operated out of a separate building, and with its own specialized equipment. There was not necessarily any correlation between rug-cleaning customers and those of the laundry, nor any correlation between the rug-cleaning business and the other phases of the petitioner's total operation.

Also in 1938, pillow-cleaning machinery was purchased at a cost of $2,616.33. The customers of the pillow-cleaning department consisted mainly of institutions requiring quantities of sanitary pillows and to some extent differed from those of the laundry department, which was primarily aimed at the family trade.

During the base period, the petitioner modernized its plant and procured other additional facilities. In 1936, some more efficient shirt-finishing equipment (known as "shirt line" equipment) was installed. An invisible marking system, which placed each customer's identification mark on every item, was installed in 1937. This system allowed commingling of different customers' laundry bundles during processing and superseded the old net system which required the laundry of each customer to be processed individually.

However, the major changes in petitioner's facilities were effectuated with equipment purchased in mid-1938 and installed during the latter part of that year. The washroom was revamped and all new equipment was installed, except for three items that had been purchased in 1936. A monorail system was added to move work from one process to another. The capacity of the extracting equipment, which previously had been the bottleneck of the washroom, was doubled, and the capacity of the washroom as a whole was somewhat increased. In the press department, a conveyor system was installed and all the footpowered presses were removed and replaced by a set of air-driven power presses. The capacity of the press department was increased by these changes.

Also in 1938, the shirt line installed in 1936 was augmented and a complete second line was added. All of the above changes necessitated an increase in the petitioner's powerplant, and an addition to its warehouse was also constructed. The new equipment required a higher caliber of worker than the petitioner had employed in the past.

Other capital expenditures were made during the base period, but these merely replaced wornout items. The schedule below, which reflects the petitioner's practice of writing off items that become fully depreciated, presents an analysis of the property account changes for the years 1936–1938. Data for other years is not available.

CHANGES IN PROPERTY ACCOUNTS FOR YEARS 1936–1938

| | 1936 | 1937 | 1938 |
|---|---|---|---|
| Buildings: Additions | | | $4,000.00 |
| Rug and pillow department: | | | |
|    Additions: Rug equipment | | | 13,232.40 |
|           Pillow equipment | | | 2,616.33 |
|    Net | | | 15,848.73 |
| Powerplant: Additions | | $3,043.30 | 9,783.27 |
| Washroom: Additions | $12,358.96 | 1,106.87 | 34,928.35 |
|    Less retirements | -0- | -0- | 4,383.79 |
|    Net | 12,358.96 | 1,106.87 | 30,544.56 |
| Other laundry depts.: Additions | 29,437.79 | 11,558.52 | 17,220.26 |
|    Less retirements | 1,768.63 | 2,689.10 | 67.50 |
|    Net | 27,669.16 | 8,869.42 | 17,152.76 |
| Drycleaning: Additions | 9,654.41 | 125.00 | 362.30 |
|    Less retirements | 1,080.05 | -0- | -0- |
|    Net | 8,574.36 | 125.00 | 362.30 |
| Furniture and fixtures: Additions | -0- | 416.00 | 100.00 |
|    Less retirements | 600.00 | 0.00 | 2,864.79 |
|    Net | (600.00) | 416.00 | (2,764.79) |
| Delivery equipment: Additions | 10,546.42 | 1,499.56 | 11,655.32 |
|    Less retirements | 1,406.89 | 0.00 | 793.50 |
|    Net | 9,139.53 | 1,499.56 | 10,861.82 |
|    Subtotal of net additions | 57,142.01 | 15,060.15 | 85,788.65 |
| Revenue agent adjustments | [1] (495.00) | | 4,116.17 |
|    Total yearly change | 55,685.09 | 15,060.15 | 89,904.82 |

[1] Apparently should be ($1,456.92), discrepancy of ($961.92) is not explained.

Early in 1938, the petitioner learned that the National Linen Supply Company (hereinafter referred to as National) was planning to commence business on a permanent basis in the Fort Worth area. National is a large linen supply concern operating in the southern States. Unlike the petitioner and most other linen supply companies, National is a vertically integrated concern that produces most of its own requirements, such as linens, soaps, truck bodies, laundry machinery, cabinets, and other equipment and supplies.

The petitioner was informed that National would attempt to purchase all the linen supply firms in Fort Worth, and if not successful, attempt to capture the market through intense competitive operations, but that said operations would eventually end.

Petitioner was apprehensive of National's coming entry into the Fort Worth area, and in order to solidify its own position, began to reduce its linen supply prices in the early part of 1938. During that year significant price reductions occurred.

Other anticipatory moves on the part of the petitioner included the establishment of four rural linen supply routes in January 1939, and seven additional such routes in June 1939. Each route required the use of a truck, and all 11 trucks used on these routes were purchased in December 1938. Although these routes proved very un-

profitable, they were not discontinued until sometime in 1941. In addition, petitioner for the first time deviated from its policy of only supplying white merchandise to its linen supply customers and introduced, to a limited extent, colored merchandise by the end of 1938 or the beginning of 1939. This change occurred because petitioner believed that National would offer colored merchandise and petitioner wanted to maintain its competitive position.

The petitioner also started employing linen supply solicitors in 1938. Gradually, the number of solicitors grew to 10 or 12 in an effort to keep existing customers, capture competitors' customers, and obtain the business of new establishments.

Prior to National's entry into the Fort Worth area, the petitioner was its leading linen supply concern. It held about 40 per cent of that business and had the larger accounts. Competition, prior to National's entry, was not severe, although in 1938 some other linen supply firms also reduced their prices, and some of petitioner's customers were offered lower prices by competitors.

National offered to purchase the petitioner's linen supply business and that of other such concerns in 1938 and also in the early part of 1939. However, of the 16 linen supply firms then operating in Fort Worth, National was only able to acquire 7 of the smaller companies.

Although National had started constructing its plant in 1938, it did not actually commence operations until June 1939. During the first 3 weeks of operation, the washing process caused an obnoxious odor in National's merchandise, and National lost about one-half of the linen supply accounts it had purchased.

In an attempt to gain business, National brought in a crew of trained linen supply solicitors about the middle of 1939. This crew was quite active in soliciting business for National. Their methods included solicitations of petitioner's regular customers as well as door-to-door canvassing. The crew's efforts were initially directed toward the larger accounts, and it even followed petitioner's trucks in a few instances. The crew remained active in the Fort Worth area until the end of 1939 or the beginning of 1940. In addition, National offered potential customers varying amounts of free service and very attractive prices. National's customers were allowed to choose the type of merchandise they wanted, irrespective of cost, quality, color, or manufacturer, and then National would supply the chosen items. National attempted to secure the larger accounts first, but also went into the rural areas.

After National began operations, petitioner again reduced its linen supply prices, gave limited amounts of free service, and purchased substantial amounts of new merchandise in order to meet competition. The new merchandise consisted of some white linens of a higher quality than that previously used and substantial quantities of colored

items. Both types of merchandise were more costly than the standard lines of white merchandise that petitioner had previously offered. Items already in petitioner's stock, and still usable, became obsolete; consequently, petitioner then entered the grease rag business.

The petitioner held meetings and trained its 24 laundry routemen in the aspects of the linen supply business, and then had them canvass their laundry territories for linen supply business. In addition, petitioner's approximately 300 laundry employees were requested to make lists of potential linen supply customers, and they were informed of a commission to be paid them on any new business obtained through their efforts.

The severe competition engendered by National's entry into the Fort Worth area significantly diminished by the end of 1939 or the beginning of 1940, and ended by November 1941. During this period, the petitioner lost some of its customers, but was able to capture other customers away from competitors.

Income and expense figures for all phases of petitioner's business during the base period, as adjusted for Federal income tax purposes, and including "employee free work," [2] are stipulated as follows:

| Accounts | 1936 | | 1937 | | 1938 | | 1939 | |
|---|---|---|---|---|---|---|---|---|
| | Dollars | Per cent | Dollars | Per cent | Dollars | Per cent | Dollars | Per cent |
| Sales (less overcharges) | $346,494.59 | 100.00 | $366,705.10 | 100.00 | $390,491.54 | 100.00 | $449,896.11 | 100.00 |
| Less: | | | | | | | | |
| Productive labor | 90,856.85 | 26.22 | 94,842.83 | 25.86 | 107,726.52 | 27.59 | 123,064.41 | 27.35 |
| Productive supplies | 48,507.00 | 14.00 | 64,974.41 | 17.72 | 53,315.49 | 13.65 | 77,704.73 | 17.27 |
| Powerplant | 10,883.73 | 3.14 | 14,374.27 | 3.92 | 17,268.16 | 4.42 | 16,029.02 | 3.56 |
| Buildings | 7,482.18 | 2.17 | 7,090.58 | 1.93 | 7,708.01 | 1.97 | 5,901.63 | 1.31 |
| Machinery | 10,670.68 | 3.08 | 13,482.76 | 3.68 | 18,770.78 | 4.81 | 19,204.40 | 4.28 |
| Indirect overhead | 14,975.22 | 4.32 | 18,586.44 | 5.07 | 25,960.10 | 6.65 | 28,789.53 | 6.40 |
| Collection and delivery | 70,900.04 | 20.46 | 75,722.38 | 20.65 | 88,371.06 | 22.63 | 116,003.35 | 25.78 |
| Sales promotion | 14,568.25 | 4.20 | 14,895.14 | 4.06 | 16,930.13 | 4.34 | 17,177.61 | 3.82 |
| General and administrative | 41,867.46 | 12.08 | 43,377.40 | 11.83 | 46,249.09 | 11.84 | 48,841.38 | 10.86 |
| Total expenses | 310,711.21 | 89.67 | 347,346.21 | 94.72 | 382,299.34 | 97.90 | 452,716.06 | 100.63 |
| Operating income | 35,783.38 | 10.33 | 19,358.89 | 5.28 | 8,192.20 | 2.10 | (2,819.95) | (.63) |
| Less non-op. exp | 2,098.49 | .61 | 2,419.32 | .66 | 3,261.85 | .86 | 2,934.00 | .65 |
| Add non-op. income | 1,594.69 | .46 | 577.05 | .16 | 312.80 | .08 | 3.13 | |
| Net income or loss per RAR | 35,279.58 | 10.18 | 17,516.62 | 4.78 | 5,243.15 | 1.32 | (5,750.82) | (1.28) |

[2] Work done free for employees. It was considered a general and administrative expense and totaled:

1936 _____ $7,433.45 | 1938 _____ $9,195.67
1937 _____ 8,416.15 | 1939 _____ 13,343.09

Petitioner's stipulated gross receipts and net income for the years 1922 through 1939 are set forth below and include all phases of petitioner's business.

| Year | Gross receipts | Net income | Percentage of gross receipts | Year | Gross receipts | Net income | Percentage of gross receipts |
|---|---|---|---|---|---|---|---|
| 1922 | $208,425.97 | $8,820.23 | 4.28 | 1931 | $339,962.58 | $14,101.26 | 4.15 |
| 1923 | 202,178.42 | 5,908.73 | 2.92 | 1932 | 265,429.85 | (7,367.46) | (2.78) |
| 1924 | 213,380.07 | 8,105.91 | 3.80 | 1933 | 233,485.18 | (8,905.73) | (3.81) |
| 1925 | 197,653.21 | 1,364.43 | 0.69 | 1934 | 247,761.17 | 1,180.84 | 0.48 |
| 1926 | 227,290.18 | 15,147.67 | 6.66 | 1935 | 256,347.60 | 218.36 | 0.09 |
| 1927 | 287,736.45 | 5,925.34 | 2.06 | 1936 | 339,061.14 | 35,279.58 | 10.41 |
| 1928 | 343,810.91 | 5,042.25 | 1.47 | 1937 | 358,288.95 | 17,516.62 | 4.89 |
| 1929 | 400,537.73 | 13,799.23 | 3.45 | 1938 | 381,295.87 | 5,243.15 | 1.38 |
| 1930 | 425,741.30 | 14,104.56 | 3.31 | 1939 | 436,553.02 | (5,750.82) | (1.32) |

Petitioner's net income from all phases of its business for the years 1922 through 1939 totaled $129,734.65, and its average net income for that period was $7,207.48. Petitioner's gross receipts, net income, percentage of net income to gross receipts, and average net income for the 4-year periods from 1922 through 1939 were as follows:

| 4-year period | 4-year gross receipts | 4-year net income | 4-year percentage of net income to gross receipts | 4-year average net income |
|---|---|---|---|---|
| 1922–1925 | $821,637.67 | $24,199.30 | 2.95 | $6,049.82 |
| 1923–1926 | 840,501.88 | 30,526.74 | 3.63 | 7,631.68 |
| 1924–1927 | 926,059.91 | 30,543.85 | 3.30 | 7,635.96 |
| 1925–1928 | 1,056,490.75 | 27,480.19 | 2.60 | 6,870.05 |
| 1926–1929 | 1,259,375.27 | 39,914.99 | 3.17 | 9,978.75 |
| 1927–1930 | 1,457,826.39 | 38,871.88 | 2.67 | 9,717.97 |
| 1928–1931 | 1,510,052.52 | 47,047.30 | 3.12 | 11,761.82 |
| 1929–1932 | 1,431,671.46 | 34,637.59 | 2.42 | 8,659.40 |
| 1930–1933 | 1,264,618.91 | 11,932.63 | 0.94 | 2,983.16 |
| 1931–1934 | 1,086,638.78 | (991.09) | (0.09) | (247.77) |
| 1932–1935 | 1,003,023.80 | (14,873.99) | (1.48) | (3,718.50) |
| 1933–1936 | 1,076,655.09 | 27,773.05 | 2.58 | 6,943.26 |
| 1934–1937 | 1,201,458.86 | 54,195.40 | 4.51 | 13,548.85 |
| 1935–1938 | 1,334,993.56 | 58,257.71 | 4.36 | 14,564.43 |
| 1936–1939 | 1,515,198.98 | 52,288.53 | 3.45 | 13,072.13 |

Gross receipts and net income for the petitioner on a departmental basis during the base period are stipulated as follows:

| | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| **All departments:** | | | | |
| Gross receipts | $339,061.14 | $358,288.95 | $381,295.87 | $436,553.02 |
| Net income | 35,279.58 | 17,516.62 | 5,243.15 | (5,750.82) |
| **Laundry department:** | | | | |
| Gross receipts | 169,393.10 | 179,544.03 | 207,569.79 | 233,941.01 |
| Net income | 32,629.69 | 21,380.91 | 5,904.77 | 5,863.00 |
| **Drycleaning department:** | | | | |
| Gross receipts | 81,272.16 | 81,763.45 | 89,739.31 | 97,760.54 |
| Net income | (4,461.95) | (2,756.68) | (1,982.31) | (1,076.20) |
| **Linen supply department:** | | | | |
| Gross receipts | 75,299.67 | 77,690.12 | 65,886.60 | 81,678.30 |
| Net income | 4,757.02 | (5,545.76) | (1,656.84) | (14,078.06) |
| **Fur storage department:** | | | | |
| Gross receipts | 13,096.21 | 19,291.35 | 14,329.21 | 11,660.00 |
| Net income | 2,354.82 | 4,438.15 | 2,845.96 | 3,235.00 |
| **Rug-cleaning department:** | | | | |
| Gross receipts | | | 3,770.96 | 11,513.17 |
| Net income | | | 131.57 | 305.44 |

The following stipulated figures represent a comparison of the petitioner's linen replacements with linen supply department sales:

| Year | Linen Replacements | Net Towel [Linen] Supply Sales | Percentage of Replacements To Sales |
|---|---|---|---|
| 1923 | $12,968.20 | x | |
| 1924 | 14,742.28 | x | |
| 1925 | 13,773.16 | x | |
| 1926 | 18,036.69 | x | |
| 1927 | x | x | |
| 1928 | x | x | |
| 1929 | 17,320.39 | x | |
| 1930 | 22,845.03 | x | |
| 1931 | 18,263.96 | $89,047.03 | 20.51 |
| 1932 | 10,918.34 | 66,617.08 | 16.39 |
| 1933 | 8,619.37 | * | |
| 1934 | 12,716.32 | 68,242.51 | 18.63 |
| 1935 | 11,470.71 | 63,559.41 | 18.05 |
| 1936 | 14,289.19 | 75,299.67 | 18.98 |
| 1937 | 20,700.02 | 77,690.12 | 26.64 |
| 1938 | 14,113.28 | 65,886.60 | 21.42 |
| 1939 | 29,746.22 | 81,678.30 | 36.42 |
| 1940 | 43,443.33 | 108,761.11 | 39.94 |
| 1941 | 65,281.91 | 161,537.75 | 40.41 |
| 1942 | 55,393.78 | 183,699.22 | 30.15 |
| 1943 | 39,708.79 | 220,930.07 | 17.97 |
| 1944 | 50,673.49 | 242,941.54 | 20.86 |
| 1945 | 56,131.48 | 244,434.50 | 22.96 |

x Unavailable.
* Towel Supply Sales for December 1933 are unavailable. From January 1 to November 30, 1933, Net Towel Supply Sales were $53,990.53.

OPINION.

The petitioner is seeking relief under section 722 (b) (1), (b) (2), (b) (4), and (b) (5). Section 722 (a) provides that before the petitioner can be granted relief under section 722 (b) it must (1) establish that it qualifies for relief because the tax computed without the benefit of section 722 results in an excessive and discriminatory tax, and (2) establish a fair and just amount representing normal earnings to be used as a constructive average base period net income (CABPNI), which is in excess of that otherwise determined under subchapter D. *Robertson Factories, Inc.*, 31 T.C. 1106, 1120; *Atlas Foundry Co.*, 31 T.C. 623, 628.

*Section 722(b) (1) and (5).*

Petitioner has alleged that it qualifies for relief under section 722 (b) (1) because normal operations were interrupted in 1938 by its remodeling program, and under section 722 (b) (5) because in 1938 and 1939 its management was so deeply involved in the linen supply "price war" that it was unable to devote adequate time and attention to the other phases of petitioner's business.

Petitioner has shown considerable remodeling and additions to plant, but has failed to show to what extent this activity interrupted normal operations. Nor is there any proof that either of these factors reduced normal earnings during the base period. Petitioner has not used either factor in its calculation of CABPNI.

Even if we were to assume that petitioner was eligible for relief under section 722 (b) (1) and (b) (5), we would have to conclude that

a fair and just amount attributable to relief under those sections had not been established and thus no relief based on them can be granted. *Atlas Foundry Co., supra.*

## Section 722 (b) (2).

In order for petitioner to prove that it is eligible for relief under section 722(b)(2), it must establish that (1) its business (or the business of the industry of which it is a member) was depressed in the base period; (2) this depression was caused by a temporary economic circumstance; and (3) such circumstance was unusual in the case of the petitioner (or its industry). *Robertson Factories, Inc., supra* at 1119. Petitioner contends that from the middle of 1938 to the end of the base period its business was temporarily depressed due to the unusual occurrence of a "disastrous and ruinous price war." Petitioner's contention is based on the premise that during the base period National precipitated a price war in which it used unfair and illegal competitive practices.

We agree with the petitioner that such a price war might establish petitioner's eligibility for relief,[3] but the record fails to establish that fact.

National did not begin operations in the Fort Worth area until June 1939. Petitioner contends that National commenced its severe and illegal competitive practices immediately but admits that such practices had "eased off" by late 1939 or early 1940 and had stopped altogether by November 1941. Thus, even assuming that the above practices constituted and that there was a "ruinous price war," its duration during the base period was 6 months or less.

Petitioner would have us lengthen this period to 18 months on the theory that it had considered it necessary to its continued existence to anticipate National's entry by about 1 year and that it had done so by cutting prices, furnishing more expensive linens, and establishing rural linen supply routes.

Whether such a unilateral course of action could ever be considered as the statutory "unusual temporary economic circumstance," e.g., a price war, ruinous or otherwise, is a question we need not now decide, for in this case the record will not support any such conclusion. The amounts of petitioner's price reductions are not shown. Linen re-

---

[3] In *Winter Paper Stock Co.,* 14 T.C. 1312, 1318 (1950), we expressly approved section 35.722–3(b) of Regulations 112, at page 130, which states the following:

"An example in which temporary economic events caused business depression during the base period of an industry of which the taxpayer was a member would be an industry the members of which (including the taxpayer) were engaged in a ruinous price war during several of the base period years. As a result of sales below cost in such years, the members of the industry sustained severe losses; when the price war was ended, the members again realized normal average earnings. The business of the taxpayer in such case would be depressed during the base period because of the fact that an industry of which the taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry and the average base period net income of such taxpayer would be an inadequate standard of normal earnings."

placements in 1938 are below 1937 both dollarwise and as a percentage of sales, and are well within the range of petitioner's long-term averages commencing in 1931. Rural routes [4] were not started until January 1939 when four such routes were established, seven more being added in June of that year.

We have often said that active competition is a normal factor in business and cannot be considered temporary or unusual. *Winter Paper Stock Co., supra; Lamar Creamery Co.*, 8 T.C. 928; *Harlan Bourbon & Wine Co.*, 14 T.C. 97; *Permold Co.*, 21 T. C. 759.

Considering all of the facts of record we conclude that prior to National's entry in June 1939 the very most that petitioner has proved is active competition and that there existed no temporary economic circumstance unusual in the case of the taxpayer—in short, no price war—and that petitioner has so far failed to qualify itself for section 722(b)(2) relief.

Petitioner has presented a much stronger case for the last half of 1939. First, the alleged "culprit" is actually in the field and petitioner's actions are no longer unilateral. There is much credible evidence that many of National's competitive practices were sharp. Surveillance, offers to buy out competitors, and offers of rebates and free goods are well recognized indicia of a monopolist. On the other hand we have not been shown either petitioner's or National's actual prices or that National's prices were below its cost.

Thinkably National's costs were below petitioner's, since National was a vertically integrated concern and as a result might have been able to make a profit at the price levels existing during the last half of 1939 while petitioner sustained losses under those same conditions. Such a situation would be active and even severe competition with a more efficient antagonist, but it would hardly constitute a price war, nor would it necessarily be unusual or temporary. Without having actual prices and price changes we cannot conclude that petitioner was engaged in a price war during this period.

We are also led to this conclusion because (1) National's competition directly affected only one segment of petitioner's business, i.e., towel and linen supply, which segment comprised only about 20 per cent of petitioner's total activity. The record does not disclose any material, indirect effect on any other phase of petitioner's business; and (2) even if we were to consider that petitioner was engaged in a "ruinous price war" after National's entry in June 1939, yet it occupied only 6 months or less of the 4 base period years, and where, as here, the ultimate question is whether or not base period earnings fairly and justly represent normal earnings, it is self-evident that the weight to be accorded to a petitioner's showing of abnormal base period conditions will vary, *inter alia*, according to the duration of

[4] Establishment of the rural routes could easily be termed an "adverse managerial decision" upon which no relief can be premised. Cf. *Empire Construction Co.*, 31 T.C. 857, 871–873.

such conditions and the portion of petitioner's business shown to be affected.

In view of all of the above we must conclude that petitioner has failed to qualify for relief under section 722(b)(2).

### Section 722(b)(4).

Petitioner has claimed relief under section 722(b)(4) on the ground that it changed the character of its business during the base period. These changes included the commencement of two new businesses and an alleged increase in capacity of the laundry department in excess of 40 per cent. The two businesses entered during the base period were rug cleaning and pillow cleaning. Figures for both were consolidated under the caption "rug cleaning" and the petitioner's requested CABPNI for it was $1,489.32. Petitioner's requested CABPNI for the laundry department, based upon the alleged 40 per cent increase, was $24,934.14. Petitioner does not contend for any increases in other phases of its business because of (b)(4) factors.

Assuming, but without deciding, that petitioner's allegations and CABPNI based on section 722(b)(4) relief are correct, its total reconstructed 1939 net income would be $14,504.20, developed as follows:

| | |
|---|---|
| Laundry department | $24,934.14 |
| Rug cleaning (includes pillow cleaning) | 1,489.32 |
| Drycleaning | (1,076.20) |
| Linen supply | (14,078.06) |
| Fur storage | 3,235.00 |
| Total reconstructed 1939 income | 14,504.20 |

Based on the total reconstructed 1939 earnings, and using the same procedure and index that petitioner advocated on brief, petitioner's CABPNI would equal $15,864.42,[5] which is less than the $18,137.30 already allowed petitioner under section 713(e). Thus, petitioner has failed to establish that its excess profits tax computed with the benefit of subchapter D sections, other than 722, is excessive and discriminatory, or a fair and just amount representing normal earnings greater than that already allowed without the benefit of section 722. *Midvale Co.*, 19 T.C. 1216, 1234–1235 (1953).

Reviewed by the Special Division.

*Decision will be entered for the respondent.*

---

[5] The CABPNI is computed as follows under petitioner's method:

| | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Index | 146.15% | 103.86% | 38.86% | 100.00% |
| Constructive base period net income based on 1939 reconstructed income | $21,197.89 | $15,064.06 | $5,578.32 | $14,504.20 |
| 1. Aggregate of excess profits net income, entire base period | | | | 56,344.47 |
| 2. Delete profits, lowest year (1938) | | | | 5,578.32 |
| 3. Aggregate of three remaining years | | | | 50,766.15 |
| 4. 75 per cent of average of three remaining years ($50,766.15/36 × 12 × .75) | | | | 12,691.54 |
| 5. Excess profits tax net income for lowest year in base period | | | | 5,578.32 |
| 6. Amount substituted for lowest year, line 4 above | | | | 12,691.54 |
| 7. Aggregate after substitution for lowest year, line 3 plus line 6 | | | | 63,457.69 |
| 8. Net increase, line 7 minus line 1 | | | | 7,113.22 |
| 9. CABPNI, line 1 plus line 8 ($56,344.47−$7,113.22/48 × 12) | | | | 15,864.42 |