CRANE MILLS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 28390, 41544.   Filed January 18, 1961.

*Milo W. Smith, Esq.*, for the petitioner.
*Raymon B. Sullivan, Esq.*, and *Aaron S. Resnik, Esq.*, for the respondent.

#### OPINION.

KERN, *Judge:* Respondent determined deficiencies in petitioner's excess profits tax liability for the years 1942 and 1943 in the respective amounts of $15,843.78 and $15,843.79.

Petitioner claims relief under section 722, I.R.C. 1939, resulting in alleged overpayments of excess profits taxes for the years 1940 to 1944, inclusive, in the following amounts:

| | |
|---|---|
| 1940 | $1, 085. 20 |
| 1941 | 22, 846. 15 |
| 1942 | 32, 167. 69 |
| 1943 | 32, 167. 69 |
| 1944 | 33, 954. 78 |

Petitioner's applications for relief under section 722 were disallowed by the respondent in full.

The issue before us is whether petitioner is entitled to relief from excess profits taxes under section 722 of the Internal Revenue Code of 1939, as amended, for each of the taxable years 1940 through 1944.

Petitioner seeks relief under section 722(b)(4) upon the ground that it changed the character of its business during the base period and its average base period net income does not reflect the normal operation of the business for the entire base period. The change in the character of the business upon which petitioner relies was the installation of a dry kiln during 1939.

The evidence in these cases was presented before a commissioner of this Court and the report of his findings of fact was served on the parties. Petitioner took no exceptions to the commissioner's findings of fact. Respondent took exception to certain findings of the commissioner, and such exceptions have been fully examined and considered in connection herewith.

The Court adopts the commissioner's report as its findings of fact with minor exceptions hereinafter noted. For the purposes of this opinion, the pertinent facts will be summarized only to the extent deemed necessary for a proper understanding of these cases. Ultimate findings of fact and conclusions appropriate for the disposition of the issue are hereinafter found.

Petitioner, an Oregon corporation, organized in 1931, maintained its principal offices during the taxable years at Bly, Oregon. It issued $10,000 of capital stock which remained unchanged throughout the taxable years.

In 1931 petitioner commenced manufacturing lumber after constructing a sawmill at Bly. Its manufacturing plant consisted of the sawmill, a planing mill, and other facilities. In manufacturing its lumber petitioner cut and logged the timber, mostly within a radius of 12 miles of its plant, and trucked the logs to its sawmill. Practically all of the timber cut by petitioner was ponderosa pine.

Prior to December 24, 1939, petitioner seasoned all of its lumber by air drying. Lumber dried by this method was hauled from the sawmill to the storage yard. There it was piled 12 to 16 feet high in units of courses separated by "stickers," placed crosswise, which permitted air to circulate over and through the stacked lumber. In this type of seasoning petitioner depended upon the elements for temperature,

circulation, and humidity. When winds were high and the humidity low the lumber dried unevenly creating stresses which "checked" or cracked the surface of the board and split the ends. Such checking impaired the value and lowered the grade of the lumber. Checking was a major problem with petitioner. Another problem encountered in air drying was stain from a fungus infection which developed in periods of high humidity and moderate temperatures. Some impairment to lumber resulted from steel piling bars used to keep the lumber from slipping. Checked, stained, and marred lumber was graded lower than it was when originally stacked for drying. This loss of grade was known as "degrade."

In the Bly area it took from 28 days to over 6 months to dry lumber by air. Between May 1 and September 1 lumber dried in 4 to 8 weeks, depending on its thickness. After September 1 there was a little drying but it was hardly appreciable. Such lumber could not be shipped until the latter part of April or in May.

In the same general locality and operating under the same general conditions as petitioner were two lumber companies operating dry kilns and producing kiln-dried lumber, two companies producing air-dried lumber, and one, Underwood Lumber Company, hereinafter referred to as Underwood, that operated in a comparable manner to petitioner and produced both air-dried and kiln-dried lumber.

In December 1938 Underwood began constructing a dry kiln which it finished early in 1939. The kiln cost a little less than $10,000. The first charge of lumber came out of it on or about February 4, 1939.

During 1939 petitioner constructed a dry kiln which was patterned closely after the Underwood kiln. It cost petitioner $9,527.75, and the first charge of lumber was placed in the kiln on December 24, 1939. The petitioner's and Underwood's kilns were equipped by the same manufacturer. Petitioner's kiln was a little larger as it could accommodate loads a foot higher than Underwood's kiln.

In its kiln petitioner was able to control circulation, temperature, and humidity. Lumber in the kiln dried from the center outward to the surface, whereas lumber piled in the storage yards dried from the surface inward to the center. The estimated time for drying lumber in petitioner's kiln varied with the thickness of the lumber as shown by the following table:

Selects and Shop grades_ 5/4__4½ to 5 days.
Selects and Shop grades_ 6/4__5 days, occasionally plus.
Selects and Shop grades_ 4/4__4 days and occasionally 5 unless all stock was 4/4.
Selects and Shop grades_ 8/4__6 days plus.
Common grades_____ 4/4 (heart) _____18 hours.
Common grades_____ 4/4 (sap) _____1½ to 2 days.
Common grades_____ 5/4 & 6/4_____1 day—18 per cent (gov't 1½ days).
Common grades_____ 8/4_____2½ to 3 days.

The estimated maximum annual capacity of petitioner's dry kiln, based upon lumber of different thicknesses, was as follows:

| Lumber size | Footage |
|---|---|
| 4/4 | 7, 128, 000 |
| 5/4 | 6, 840, 000 |
| 6/4 | 6, 609, 600 |
| 8/4 | 6, 336, 000 |

Petitioner expected to produce more and better grades of lumber with its dry kiln than it could produce from a like quantity of green lumber that was dried by air. It expected the dry kiln to reduce the amount of losses sustained from degrade. It expected the dry kiln to produce grades of select lumber higher than any selects previously produced by air drying. It expected to produce kiln-dried shop that would be acceptable to woodworking plants manufacturing interior finish that refused to buy air-dried shop. It expected to produce knotty pine paneling from the common grades of lumber, which it could not produce by air drying. By virtue of these better grades of selects, shop, and common and its knotty pine paneling petitioner expected to enlarge the markets for its products.

Prior to installing its kiln petitioner's president estimated that the difference in value per M (1,000 feet board measure) between air-dried and kiln-dried lumber favored kiln-dried lumber as follows:

| Grade | Amount |
|---|---|
| Select Moulding and Better | $2. 48 per M |
| Shop | 2. 10 per M |
| Common | 1. 10 per M |

During the base period years there was a normal market for ponderosa pine lumber.

A good portion of the select lumber produced in the Klamath Falls area went to the markets in the eastern part of the United States. The shop lumber was sold principally in the Middle West markets in Illinois, Iowa, Wisconsin, and Kansas. The average freight rate on this lumber during the base period was 73.5 cents per 100 pounds.

The western lumber mills computed freight charges on their lumber shipments by using standard estimated shipping weights. These freight charges were included in the invoice price. After the actual weights were determined the difference was absorbed by the seller.

The weight of lumber varies with the moisture content. Lumber of the same size and moisture content weighs the same whether air-dried or kiln-dried. Due to its high moisture content green lumber usually weighs from 5,300 to 6,000 pounds per M; after drying this lumber weighs 2,500 pounds and less per M in the rough. Under extremely favorable conditions the moisture content in air-dried lumber would get as low as 10 per cent; under the artificially induced

conditions of kiln drying the moisture content should be less than 10 per cent. Air-dried lumber at Bly usually had a higher moisture content than lumber that was kiln dried, except during July and August. During 10 months of each base period year petitioner estimated that its air-dried lumber averaged about 200 pounds more per M than like lumber kiln-dried. Petitioner's lumber, of the grades normally kiln dried, was shipped to points to which the freight rate was 73.5 cents per 100 pounds.

Petitioner's president determined that seasoning lumber by kiln drying would reduce some operational costs and increase others. He estimated a saving in transportation costs of 10 cents per M on lumber that went directly from the sawmill to the dry kiln. Any reduction in storage-yard space eliminated such expenses as snow removal, weed control, cleaning up, etc., and cut down on other expenses such as piling, yard maintenance, general overhead, and rental on yard space. The estimated savings on these expenses were about 15 cents per M.

By installing the dry kiln petitioner estimated that it would reduce subsequent inventories by 1,500,000 feet, or $21,000 at a cost of $14 per M. Petitioner estimated that it could save 6 per cent on money borrowed to finance these inventories, or $1,200; $564 on insurance on the reduced inventories; and $276.75 taxes on such reduced inventories. Petitioner also estimated that it would save 16 cents per M on spraying and dipping with an antistain solution since spraying or dipping was eliminated when lumber went through the dry kiln.

The additional expenses and costs which petitioner expected from the operation of its dry kiln were: Increase in cost of electricity of $40 to $50 per month; interest on investment in dry kiln, at 6 per cent, amounting to $571.67; and insurance and taxes on dry kiln about $173.41 and $117.19, respectively.

During the base period petitioner's average annual production of ponderosa pine was a little over 17 million board feet compared with an average annual production in the United States of a little over 3 billion board feet.

During the years 1936 through 1939 petitioner's sales of "uppers" (selects and shop or factory grades) and its total sales were as follows:

| Year | Selects | Shop | Total | |
|---|---|---|---|---|
| | | | Uppers | Sales |
| | | (Feet) | | |
| 1936 | [1] | [1] | [1] | [2] 15,818,337 |
| 1937 | 2,221,592 | 3,796,960 | 6,018,561 | 16,570,160 |
| 1938 | 1,964,892 | 1,481,160 | 3,446,052 | 14,345,732 |
| 1939 | 2,819,262 | 1,897,811 | 4,717,073 | 15,725,190 |

[1] Not available.    [2] 11 months' total.

For the years 1936 through 1939 the prices of ponderosa pine lumber, based on index average prices of the Western Pine Association, showed the following trends based on monthly lows, highs, and annual average per M:

| Year | Price in low month | Price in high month | Average annual |
|------|------|------|------|
| 1936 | $20.35—July | $21.43—December | $20.77 |
| 1937 | 24.44—January | 26.49—April | 25.24 |
| 1938 | 20.80—October | 23.34—March | 21.84 |
| 1939 | 21.37—July | 24.16—November | 22.40 |

After August 1940 prices increased almost every month throughout the taxable years.

Petitioner's sales in feet and dollars (net), its average annual price per M (derived therefrom), and the average annual price per M of Underwood and the Michigan-California Lumber Company of Camino, California, for the years 1936 through 1939, were as follows:

| Year | Petitioner's sales | | Average price per M | | |
|------|------|------|------|------|------|
| | Feet | Dollars | Petitioner | Underwood | California |
| 1936 [1] | 15,818,337 | $336,812.09 | $21.29 | $16.14 | $20.13 |
| 1937 | 16,570,160 | 557,132.76 | 33.62 | 18.21 | 23.72 |
| 1938 | 14,345,732 | 339,509.04 | 23.67 | 18.24 | 24.01 |
| 1939 | 15,725,190 | 418,485.89 | 26.61 | 17.20 | 26.46 |

[1] 11 months' total.

For the base period years petitioner's net sales, gross profit on sales, net income, and excess profits net income computed under the 1941 law were as follows (rounded figures):

| Year | Net sales | Gross profit on sales | Net income | Excess profits net income |
|------|------|------|------|------|
| 1936 | $336,812 | $41,243 | $14,819 | $15,081 |
| 1937 | 557,133 | 76,980 | 22,591 | 20,443 |
| 1938 | 339,509 | 49,352 | 17,460 | 17,460 |
| 1939 | 418,486 | 65,520 | 29,349 | 29,349 |

Petitioner's net income for the taxable years 1940 to 1944, inclusive, was stipulated as follows (rounded figures): 1940—$36,606; 1941—$109,552; 1942—$136,303; 1943—$162,833; and 1944—$121,639.

Petitioner's actual average base period net income and the additional amounts allowed under section 713(f) of the Code, computed under the law applicable for the taxable years, were as follows:

| Year | Actual ABPNI | Additional under sec. 713(f) |
|------|------|------|
| 1940 | $17,941.42 | $3,639.64 |
| 1941 | 20,696.61 | 5,415.25 |
| 1942 | 20,583.19 | 5,642.09 |
| 1943 | 20,583.19 | 5,642.09 |
| 1944 | 20,583.19 | 5,642.09 |

The index numbers of net income (less tax-exempt income) of all corporations and the lumber and wood products industry for the years 1936 to 1939, inclusive, and the base period average are as follows (1939=100):

| Year | All corporations | Lumber and wood products industry |
|---|---|---|
| 1936 | 96.92 | 77.03 |
| 1937 | 97.74 | 112.12 |
| 1938 | 35.66 | (18.64) |
| 1939 | 100.00 | 100.00 |
| (¹) | 82.58 | 67.63 |

¹ Average for base period.

During the base period years petitioner changed the character of its business and the average base period net income does not reflect the normal operation of the business for the entire base period.

The installation of a dry kiln constituted a change in the operation of the business and a difference in the capacity for production and operation.

The change in the method of doing business, consisting of the installation of the dry kiln by petitioner, would have resulted had it been installed 2 years before in increased sales, in increased prices of some of its products, and a reduction in some costs of operation.

The constructive average base period net income of the petitioner for the taxable year 1940 is $25,000, and for each of the taxable years 1941 to 1944, inclusive, is $30,000.

Petitioner seeks relief under section 722(b)(4), the pertinent portions of which appear in the margin.[1]

Petitioner claims qualifications under (b)(4) because it changed the character of its business during the base period years. It contends that the installation of its dry kiln in 1939 brought about a change in the operation of the business, a difference in the products furnished,

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

 *      *      *      *      *      *      *

(4) the taxpayer * * * during * * * the base period * * * changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had * * * made the change in the character of the business two years before it did so, it shall be deemed to have * * * made the change at such earlier time. For the purpose of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, * * *

and a difference in the capacity for operation. It further contends that because of the change it is entitled to a constructive average base period net income of at least $56,583, which it concedes should be adjusted under the variable credit rule for 1940.

Respondent contends that petitioner has failed to establish a qualifying factor; that if a qualifying factor exists petitioner has failed to establish that such factor led to a higher level of earnings; that any reasonable reconstruction would be unproductive of relief under (b) (4) in view of the relief that has been granted under section 713(f) of the 1939 Code; and that in case any relief is granted by the Court it would have to be adjusted under the variable credit rule.

We are of the opinion that petitioner has established a change in the character of its business during the base period years. Its installation of a dry kiln in 1939 constituted a definite change in the operation of its business. Prior to December 24, 1939, all of its lumber was dried by air which took from 4 weeks to 6 months. Thereafter, it could season lumber from 18 hours to "6 days plus" depending on the grade and thickness of the lumber and to the extent of the charge that its dry kiln would accommodate. As an example, the lumber placed in the dry kiln on December 24, 1939, would have been available for sale by the end of the month, whereas lumber stacked in the storage yard would have been unavailable for sale before the latter part of April or in May 1940. Petitioner's ability to control temperature, circulation, and humidity in seasoning lumber in the dry kiln was a complete change from its air-drying operation where temperature, circulation, and humidity depended upon the elements. We hold that petitioner has established a change in the operation and the capacity for operation of its business. *Schneider's Modern Bakery, Inc.*, 19 T.C. 763. See also *Crowell-Collier Publishing Co.*, 25 T.C. 1268, 1272, affd. 259 F. 2d 860; *Brown Paper Mill Co.*, 23 T.C. 47, 70, 71. We cannot agree, however, that the dry kiln substantially changed the products furnished by petitioner. *Triangle Raincoat Co.*, 19 T.C. 548, 565; *Stonhard Co.*, 13 T.C. 790.

The next question is whether the facts establish that installation of the dry kiln would have produced a higher level of earnings, and, if so, whether any reasonable reconstruction under the facts would afford petitioner any relief. Obviously, petitioner obtained scant information from the operation of the dry kiln for 7 days in 1939 as to any earnings or savings that would flow therefrom. Absent such proof, petitioner rests its reconstruction upon estimated savings on freight, yard costs and expenses, interest, insurance, local taxes, a reduction in lumber lost from degrade, and increased sales realization through better quality lumber. Recognizing that some increased costs would result from operation of the dry kiln, it offset increased elec-

trical consumption, interest on cost of kiln, increased local taxes on value of kiln, and depreciation on kiln, against anticipated savings and computed a constructive profit for 1939 from the dry kiln of $33,868 minimum and $39,127 maximum, depending upon a kiln capacity of 6,500,000 or 7 million board feet, respectively. Adding the 1939 profit before installation of the dry kiln of $29,349, petitioner computes a constructive average profit, minimum and maximum for 1939 of $63,217 and $68,476, respectively. Based thereon petitioner claims a constructive average base period net income of $56,583.

We cannot agree with either the estimated savings on the dry kiln or the anticipated increased level of earnings. We are persuaded that the dry kiln would have resulted in some increase in petitioner's level of earnings had it been installed 2 years earlier. Even without the dry kiln, it is evident from an examination of petitioner's operations that it did better during the base period than its industry, particularly in 1938. We believe that petitioner would have increased its level of earnings if it had had its dry kiln in operation 2 years earlier. We doubt, however, that its kiln would have continuously operated at maximum capacity as indicated by its reconstruction. Using our best judgment, and after carefully and fully considering all of the facts and circumstances herein we are of the opinion and have found that petitioner is entitled to a CABPNI of $25,000 for 1940 and a CABPNI of $30,000 for each of the taxable years 1941 to 1944, inclusive.

In view of the foregoing, we hold and find that petitioner's excess profits taxes for the taxable years 1940 to 1944, inclusive, computed without the benefit of section 722 of the Internal Revenue Code of 1939, as amended, are excessive and discriminatory.

An adjustment for income taxes for the year 1940 will be made under Rule 50.

Reviewed by the Special Division.

*Decisions will be entered under Rule 50.*