## THE AIR PREHEATER CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 51624. Filed September 13, 1961.

*Jay O. Kramer, Esq.,* and *Gilbert I. Falk, CPA,* for the petitioner.
*Donald W. Geerhart, Esq.,* for the respondent.

TIETJENS, *Judge:* The petitioner asks for a redetermination of the respondent's denial of relief sought pursuant to section 722 of the Internal Revenue Code of 1939 from excessive and discriminatory excess profits taxes for the years 1940 to 1945, inclusive. Relief is claimed under the provisions of section 722(b)(4) and also under section 711(b)(1)(J) and (K).

The petitioner's excess profits tax returns for the taxable years were filed with the collector of internal revenue for the third district of New York.

### FINDINGS OF FACT.

Some of the facts are stipulated and the stipulation of facts and exhibits thereto are incorporated by this reference.

The petitioner was incorporated in 1925 under the laws of New York as a wholly owned subsidiary of a Swedish company, Aktiebolaget Ljungstrom Angturbin. At all material times petitioner's principal office was in New York, New York, and its manufacturing plant in Wellsville, New York.

In 1933 the Superheater Company acquired the controlling interest in the petitioner and the Swedish company retained a minority interest. At the same time Superheater acquired control of Combustion Engineering, Inc., which was a manufacturer of boilers and of preheaters of the plate and tubular type. Superheater manufactured accessories for steam powerplants and boilers.

Petitioner is a manufacturer and seller of air preheaters for installation in public utility central generating stations, industrial powerplants, oil stills, and other plants.

The air preheater is a steam boiler accessory that adds heat to cold air to raise its temperature prior to combustion. The source of the heat is the waste gases from a boiler unit or furnace. The transfer of heat from the waste gases to the cold air is usually effected through the medium of metal surfaces. Preheated air gives better combustion in boiler furnaces, and increases boiler efficiency. At all times material hereto, every decrease of 35° F. to 40° F. in exit gas temperatures resulted in an approximate saving of 1 percent in fuel consumption.

The petitioner manufactured regenerative preheaters under a license granted in 1926 by its Swedish parent.

The Ljungstrom air preheater is a rotary type air preheater which permits continuous transfer of heat from waste gases to incoming air. It differs from the recuperative air preheater in scientific principle.

The recuperative air preheater is composed of tubes or plates which are exposed to waste gas on one side, and to cold air on the other. Heat must pass from the waste gas to the cold air through the plate or tube walls. The rate of flow depends upon the heat head, conductivity of the metal, conductivity of gas films on both sides of the metal, and upon the conductivity of any deposit that may have adhered to the metal.

The regenerative or rotary air preheater built by the petitioner does not require heat to pass through a film-deposit-metal-film barrier. Instead, heat from the waste gas is absorbed by a heating surface placed parallel to the direction of flow of gas and air which surface is then exposed to the incoming combustion air. The cold incoming air absorbs the heat from this surface.

Regenerative preheaters are constructed for either vertical or horizontal flow of gases. In the vertical preheater with a center supported rotor, the weight of the rotor is supported by a thrust bearing

above and guide bearings below. Preheaters constructed for horizontal flow of gases have always been built with rotors supported by center shafts and driven by a pinion and gear rim drive.

In a vertical regenerative preheater the air currents pass vertically through a rotor which turns in a horizontal plane. The hot gases from the furnace pass through one side of the rotor and transfer heat to the metal in the rotor, this turns slowly and the incoming cold air passing through the other side of the rotor absorbs heat from the metal. The preheated air facilitates combustion in the furnace. In a horizontal air preheater the air currents pass horizontally through a rotor which turns in a vertical plane.

Prior to 1934, the rotor of the vertical regenerative air preheater was both rim supported and rim driven. The rim support consisted of carrying rollers supported on a track around the periphery of the rotor.

The size of a regenerative preheater depends upon the following factors: (1) The volume and temperature of exit gases from the boiler, (2) the volume and temperature of incoming air for combustion, (3) the desired exit gas temperature from the preheater, and (4) the allowable preheater draft loss. The larger the boiler, the higher the volume and temperature of exit gas and the volume of air needed for combustion. Consequently, as boilers increased in size, a need developed for preheaters with increasingly larger diameter rotors.

The preheater rotor contains individual elements which transfer heat from boiler exit gas to incoming air. During the base period, these elements were constructed of 24-gauge open hearth steel sheet metal. Some special purpose preheaters were constructed with stainless steel sheet metal elements.

The object of the preheater is to effect a transfer of heat from the waste gases to the incoming air to be used in fuel combustion. Increasing the amount of heat transferred tends to lower the exit temperature of the waste gas. The dew point of temperature is reached when a solid particle carried in the gas stream becomes wetted from condensation and will stick to a surface. As the temperature of the gas is lowered the dew point is approached. Waste gases enter the preheater at temperatures between 700° and 900° F. depending on the chemical constituents, such as sulphur, of the fuel. A deposit of solid particles adhering to the preheater elements will cause corrosion. The cold end of the preheater, that is, where the gases leave and the air enters, is more subject to corrosion than the other parts. By building preheaters with separate cold end sections, the problem of corrosion can be met by cleaning or replacing such sections easily or by making them of alloy steels having a higher degree of corrosion resistance.

A brochure published by the petitioner in 1932 contains the following statement:

A recent Ljungstrom development adopted to promote permanent cleanliness, sustained high efficiency and low-cost heating surface renewal where operating conditions invite excessive corrosion or deposit, consists in dividing each heating element into two sections, so that on assembling, two separate layers are formed in the rotor. * * * The layers are separated by a thin open grating.

Where fuel of high sulphur content is burned and the temperature in an air preheater *of any make and type* drops below the dew point of the gases, the acid moisture precipitated on the heating surface tends to collect and bind floating solid particles of fly ash to the extent that such accumulations impede the draft, and the acid corrodes the metal, especially while the heater is out of service and cold.

For these extreme and rare corrosive and clogging conditions and wherever deposit of fly ash, coke dust, unburned fuel, etc., tends to partially defy the soot blower jets, infrequent washing of the rotor is often a complete remedy and the divided heating elements always help in maintaining perfect operation.

Both the cleaning and corrosion troubles, if they develop at all, are confined to a comparatively thin layer at the cold end of the rotor. Separating this thin layer from the main mass of heating surface, permits the affected surface to be dealt with separately. In case of obstinate deposit, all the top-layer heating elements can then be taken out of their cells, washed effectively and replaced at small expense within a very few hours of outage and without disturbing the main bulk of the heating surface.

In the case of acute corrosion, the heating element sections comprising the thin layer may either be made of acid-resisting metal at low extra cost, or if made of plain open-hearth steel, may be discarded and replaced at low cost.

The maximum depth of a single element in a rotor is 42 inches. A rotor with a depth greater than 42 inches requires the use of several elements in combination. The biggest element is used on the hot end of the rotor and the smallest element on the cold end. Some preheater rotors are constructed with intermediate elements in addition to the hot and cold ends. The hot end element contains alternate sheets of steel, one sheet having a diagonal crimp and the other having a combination of diagonal and vertical crimping. The cold end element consists of alternate sheets, one sheet having a vertical crimp and the other sheet being uncrimped.

At all times, 1 inch of regenerative preheater element was equivalent in heating surface to 1 linear foot of tubular preheater. In terms of weight, a regenerative preheater weighs half as much as an equivalent plate or tubular preheater.

The license under which the petitioner built generative preheaters was amended in 1927, 1933, and 1937. The license permitted the petitioner to make use of all patents and patent applications owned by the Swedish company for stationary boilers and other stationary plants, and required payment of certain royalties upon each air preheater sold based upon selling price. The 1937 amendment provided that the petitioner was to fix the price charged for all preheaters sold.

After acquiring a controlling interest in the petitioner, the Superheater Company provided new management, engineering services, access to patents owned by Superheater, and additional capital. A management agreement was entered into between Superheater and the Swedish company specifying the services to be furnished by Superheater and a consideration of fees or commissions for such services. This agreement was amended or modified from time to time and was terminated in 1940, when a new agreement was effected. Superheater agreed in 1933 to furnish managerial and supervisory assistance, pay sales expenses other than commissions, pay administrative expense, publicity expense, and provide supervision of accounting, engineering, and manufacturing within the scope of Superheater's organization, and legal and patent assistance, except for outside fees, costs, and direct expenses. The annual management fee was to be $65,000 if sales did not exceed $150,000, larger fixed amounts if sales were between $150,000 and $550,000 and 20 percent if sales exceeded $550,000. In 1935 the fee was fixed at a flat amount of $35,000 per year. In 1937 this provision was canceled and revised to provide that Superheater would receive 20 percent on sales, less royalties and certain other items, except that if total sales were less than $550,000 in any calendar year a fixed schedule should apply. A modification in 1938 provided a minimum fee of $60,000 plus 10 percent of sales in excess of $250,000. A new agreement in 1940 provided a monthly fee of $416.66 terminable on 10 days' notice after 1940, in consideration of consulting and supervisory assistance as to purchases, accounting, financial and tax matters, audits, corporate, legal, and patent matters not requiring services of outside attorneys.

In the years 1933 through 1945 the petitioner paid to Superheater the following fees pursuant to the foregoing agreements:

| | | | |
|---|---|---|---|
| 1933 | $28,333 | 1940 | $34,148 |
| 1934 | 95,000 | 1941 | 5,000 |
| 1935 | 35,000 | 1942 | 5,000 |
| 1936 | 35,000 | 1943 | 5,000 |
| 1937 | 181,373 | 1944 | 5,000 |
| 1938 | 90,102 | 1945 | 5,000 |
| 1939 | 81,045 | | |

The following schedule shows the petitioner's gross sales, gross profit, and net income (or loss) for the years 1933 through 1939:

| Year | Gross sales | Gross profit | Net income |
|---|---|---|---|
| 1933 | $146,996 | $22,208 | ($81,011) |
| 1934 | 261,994 | 78,966 | (75,911) |
| 1935 | 216,720 | 61,550 | (41,442) |
| 1936 | 474,154 | 218,569 | 77,045 |
| 1937 | 1,170,035 | 500,242 | 107,995 |
| 1938 | 575,554 | 258,954 | 33,446 |
| 1939 | 464,591 | 223,305 | 39,249 |

During the years 1933 through 1939 the petitioner paid the following royalties to the Swedish company:

| Year | Royalties | Year | Royalties |
|------|-----------|------|-----------|
| 1933 | $4,927 | 1937 | $43,015 |
| 1934 | 2,805 | 1938 | 23,221 |
| 1935 | 564 | 1939 | 3,279 |
| 1936 | 7,497 | | |

During the period prior to 1933 the petitioner received various complaints concerning its preheaters. Some were about the fans furnished as an integral part of the installation. The petitioner in 1929 or 1930 ceased to build fans for its preheaters. Other complaints related to excessive wear of the carrying rollers used to support the vertical preheater rotor at the rim. This problem was more serious with the larger sizes.

The petitioner's engineers had prepared in 1931 a plan for a vertical preheater with a center supported rotor, with a support bearing located beneath the rotor. This plan was not accepted by the Swedish parent company and no rotor of this type was built. The center support rotor later designed and used by the petitioner had a support bearing located above the rotor, and guide bearings below.

The petitioner received its first order for vertical preheaters built with center supported rotor and center drive in December 1933. These were built in 1934 and shipped in June 1935. The last order petitioner filled for a vertical preheater with a rim supported rotor was received in 1935 and the preheater was shipped in that year. Petitioner has never since manufactured vertical regenerative preheaters with rim supported rotors.

Prior to the use of a center supported center driven rotor in a vertical preheater, when the rotor was supported by carrying rollers at its periphery, it was necessary for sizes of 15-foot diameter and larger to use counterweights for additional support.

The lapse of time between the date of an order for a preheater and date of delivery would vary from 6 months to 2 years, depending upon size of the equipment and construction schedule of the plant where it was to be installed, and possibly additional time would be required before installation would be completed.

The design change to center rotor support and drive for vertical preheaters was necessary because of changes in boiler design to larger boilers requiring heavier preheaters. The center support and drive design proved satisfactory in operation and customer complaints decreased.

After the petitioner developed the center support and drive devices for its vertical preheaters it was able to adapt these improvements to earlier installations. In a brochure published by the petitioner in 1939, it was stated:

The success of the center drive and support, first applied to vertical flow Ljungstrom preheaters in 1934, has prompted a number of operators to modernize installations made prior to that date. This has been done by adding the top and bottom shafts to the existing rotor, installing the bearings and drive, and removing the present carrying rolls, rack and pinion and drive. The cost of making this change is relatively low, and is justified on the basis of reduced repairs, longer life of seals, and the accompanying reduced leakage.

*         *         *         *         *         *         *

The many advantages of Ljungstrom two-layer heating surface are available to existing installations now equipped with the single layer type. The substitution may be made without changes to the rotor structure or any other part of the preheater.

Two-layer surface is available both in the modern notched, undulated surface and in older types. All surfaces are interchangeable and, therefore, the advantages of the newer designs may be realized in old installations.

The value of standardized sizes of Ljungstrom preheaters may be well appreciated when, due to continued development, improvements in design and operation may be taken advantage of in existing installations, with only minor changes in the existing structure, and at nominal cost.

In the 1920's and 1930's, the use of pulverized coal as boiler fuel was increasing and by the end of 1939 it was used almost exclusively in public utility and industrial powerplants. This fuel required more highly preheated air. In the boiler industry the use of alloy steels in the 1930's materially increased the temperature capabilities of boilers. Turbine and boiler manufacturers tended to use higher temperatures and higher pressures to effect economy in the generation of electricity. Also fuel costs were rising in the base period. The trend was toward larger boilers and therefore larger air preheaters. The preheaters built by the petitioner required less space than the tubular and plate types and provided more efficient heat recovery in relation to size.

The petitioner generally sold its preheaters to the boiler manufacturer which was responsible for the entire steam generating installation. The size of the preheater would be determined from the size of the boiler, the quantity and temperature of the waste gas and of the air needed for combustion and the temperatures that could be handled by the cold end elements of the preheater. During the base period the petitioner built larger vertical preheaters with the center drive and support, having diameters of 18 or 20 feet and depth of element of 60 to 70 inches. The rotor of this size contained as much as 123,000 square feet of heating surface and weighed 30 tons. The maximum diameter of the rim supported type was 15 feet with a depth of 42 inches, containing 25,000 square feet of heating surface and weighing 6¼ tons.

The petitioner's balance sheets for the end of the years 1933 to 1939 showed the following (in thousands of dollars) :

| Year | Current assets | Capital assets | Total assets | Current liabilities | Debt | Capital and surplus |
|------|------|------|------|------|------|------|
| 1933 | $136 | $286 | $428 | $20 | $250 | $153 |
| 1934 | 204 | 256 | 465 | 39 | 344 | 77 |
| 1935 | 232 | 235 | 471 | 47 | 378 | 36 |
| 1936 | 372 | 217 | 593 | 110 | 376 | 95 |
| 1937 | 735 | 251 | 989 | 388 | 376 | 161 |
| 1938 | 424 | 257 | 683 | 96 | 376 | 186 |
| 1939 | 495 | 246 | 743 | 227 | 294 | 212 |

The petitioner's base period shipments of regenerative preheaters for domestic new boiler application, in terms of square feet of heating surface, were:

| Year | Vertical | Horizontal |
|------|------|------|
| 1936 | 769, 500 | 321, 100 |
| 1937 | 1, 944, 600 | 167, 000 |
| 1938 | 820, 500 | 355, 000 |
| 1939 | 633, 400 | 406, 900 |

The petitioner's base period sales of regenerative preheaters in units shipped, pounds, and dollars, were:

| Year | Unit | Pounds | Dollars |
|------|------|------|------|
| 1936 | 50 | 1, 615, 503 | $351, 749 |
| 1937 | 80 | 3, 579, 011 | 1, 021, 544 |
| 1938 | 43 | 1, 804, 371 | 473, 007 |
| 1939 | 28 | 1, 444, 141 | 335, 140 |

The following schedule shows the petitioner's in-process inventory pertaining to uncompleted contracts as of the end of each of the years 1935 through 1939:

| End of year— | Number of preheaters | Costs incurred |
|------|------|------|
| 1935 | 11 | $16, 377 |
| 1936 | 34 | 34, 437 |
| 1937 | 39 | 100, 717 |
| 1938 | 11 | 36, 808 |
| 1939 | 34 | 82, 688 |

The following schedule shows the total orders for steel boilers and water tube boilers in the United States in thousands of square feet during the years 1934 through 1941:

| Year | Thousands of square feet | Year | Thousands of square feet |
|------|------|------|------|
| 1934 | 4, 369 | 1938 | 7, 729 |
| 1935 | 6, 246 | 1939 | 11, 098 |
| 1936 | 11, 512 | 1940 | 17, 233 |
| 1937 | 9, 923 | 1941 | 25, 786 |

The following schedule shows the estimated value in millions of dollars of new private public utility and industrial construction in the United States during the years 1933 through 1939:

| Year | Public utility | Industrial | Total |
|---|---|---|---|
| 1933 | $261 | $176 | $437 |
| 1934 | 326 | 191 | 517 |
| 1935 | 363 | 158 | 521 |
| 1936 | 518 | 266 | 784 |
| 1937 | 705 | 492 | 1,197 |
| 1938 | 605 | 232 | 837 |
| 1939 | 683 | 254 | 937 |

The petitioner reported its income for tax purposes under the completed contract method of accounting and covering calendar years. It operated at a loss during each of the years 1931 to 1935, inclusive.

On September 15, 1943, the petitioner filed applications for relief under section 722 of the Internal Revenue Code of 1939 for the years 1940, 1941, and 1942. On June 30, 1949, the petitioner filed amended applications for relief for such years and filed applications for relief for the years 1943, 1944, and 1945.

Petitioner is entitled to compute its excess profits credit under the income credit method provided by section 713 of the Internal Revenue Code of 1939. Petitioner computed its excess profits credit under the income credit method for each of the taxable years here involved.

Petitioner's excess profits net income for each of the base period years, and its 4-year average, is as follows:

| Year | Excess profits tax taxable year— | | |
|---|---|---|---|
| | 1940 | 1941 | 1942-45 |
| | Amount | | |
| 1936 | $68,381.36 | $78,662.18 | $78,672.18 |
| 1937 | 91,035.00 | 105,817.29 | 106,281.90 |
| 1938 | 36,497.12 | 43,313.93 | 38,591.77 |
| 1939 | 32,677.29 | 39,153.30 | 39,248.53 |
| Total | 228,590.77 | 266,946.70 | 262,794.38 |
| 4-year average | 57,147.69 | 66,736.68 | 65,698.60 |

Petitioner's excess profits net income for each of the years 1940 through 1945, computed under the income credit method provided by section 711(a)(1) of the Internal Revenue Code of 1939, is as follows:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1940 | $247,332.36 | 1943 | $400,376.51 |
| 1941 | 464,640.27 | 1944 | 285,984.04 |
| 1942 | 378,221.41 | 1945 | 231,872.23 |

Petitioner filed claims for refund, Form 843, for refund of excess profits taxes with the collector of internal revenue, third district, New York, as follows:

| Year | Amount | Date filed |
|------|--------|------------|
| 1941 | $1,216.51 | June 30, 1947 |
| 1942 | 16,953.96 | Nov. 4, 1947 |

The petitioner's excess profits credit for the taxable years 1940 through 1945, computed without the benefit of section 722, is as follows:

| | 1940 | 1941 | 1942–45 |
|------|------|------|---------|
| Excess profits net income 1936 | $68,381.36 | $78,662.18 | $78,672.18 |
| 1937 | 91,035.00 | 105,817.29 | 106,281.90 |
| 1938 | 36,497.12 | 43,313.93 | 38,591.77 |
| 1939 | 32,677.29 | 39,153.30 | 39,248.53 |
| Aggregate | 228,590.77 | 266,946.70 | 262,794.38 |
| Average base period net income | 57,147.69 | 66,736.68 | |
| Excess profits tax credit at 95% | 54,290.31 | 63,399.85 | |
| Increase in lowest year of base period | | | 17,458.88 |
| Total | | | 280,253.26 |
| Average base period net income | | | 70,063.31 |
| Excess profits tax credit at 95% | | | 66,560.15 |

The petitioner did not change the character of its business in the base period by reason of a change in management or by a difference in products furnished.

The petitioner has not established that its average base period net income was an inadequate standard of normal earnings.

Supervisory and management fees paid by the petitioner in the base period were not abnormal in class or in amount.

### OPINION.

The petitioner contends that it is entitled to relief from excessive and discriminatory excess profits taxes for the years 1940 through 1945 because it changed the character of its business immediately prior to the base period through a reorganization and a change in management as a result of which it materially changed its product, that because of such change its average base period net income is an inadequate standard of normal earnings and that it has established a fair and just amount representing normal earnings to be used as a constructive average base period net income.

Section 722 (b) (4) of the Internal Revenue Code of 1939 [1] provides relief in cases where the taxpayer, during or immediately prior to the

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(4) the taxpayer, either during or immediately prior to the base period, * * * changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which

base period, changed the character of its business and the average base period net income does not reflect the normal operation of the business for that period. Qualifying changes include a change in operation or management or a difference in products.

The petitioner's management was changed in 1933. In that year the Superheater Company acquired a controlling interest in the petitioner and made changes in the managing personnel.

The vertical preheaters made by the petitioner prior to 1933 were constructed with a rotor which was supported and driven at the rim. This type of construction, according to the petitioner, was not practical with a rotor of greater diameter than 15 feet or a depth greater than 42 inches. The petitioner had received complaints that these products were inefficient and required excessive maintenance due to wear of the carrying rollers which supported the rotor. The change in product relied upon by the petitioner was the development of preheaters with a rotor supported and driven at the center, and with a separate element at the cold end. This type of construction enabled the petitioner to build larger preheaters with rotors of greater efficiency and requiring less maintenance expense and to meet the problem of corrosion by a separate and replaceable cold end element of alloy metals having more corrosion resistance than the steel used for the hot end elements. There was a trend in the industry toward larger boilers and higher temperatures requiring larger preheaters of increased efficiency in transferring heat. The change made it possible for the petitioner to design and build larger preheaters for this purpose. The petitioner argues that if this change had occurred 2 years earlier it would have been able to sell larger preheaters in the base period and to have received larger earnings.

The petitioner contends that its actual average base period net income was an inadequate standard of normal earnings because the new product required a period of testing before it was accepted by the engineering profession and by public utilities. A period of 6 months to 2 years might be required from the date of an order to the date of delivery to a purchaser or the date that the unit went into operation in a new powerplant. The first units with center drive and support went into operation in February 1936. The petitioner guaranteed 1 year's operation and not until that period expired could petitioner expect its product to be recommended by engineers. Sometimes 2 years are required for planning a public utility installation and ordering the equipment with another period of 6 to 24 months for building and shipping the unit. Therefore, petitioner argues, it did not fully

it would have reached if the taxpayer had * * * made the change in the character of the business two years before it did so, it shall be deemed to have * * * made the change at such earlier time. For the purpose of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products * * *

realize the benefits during the base period from sales of larger preheaters which were then available.

The petitioner, to establish a constructive average base period net income, CABPNI, shows that it was increasing the size of its vertical preheaters sold in the base period and the profit per unit was increasing as well as the average number of square feet of heating surface per unit sold for new boiler installations. Because of the time lag between receipt of an order and shipment of a preheater, the petitioner received orders for increasingly larger units which were not shipped until after the base period. Therefore, petitioner contends, it did not achieve by the end of 1939 the earnings level it would have achieved had it had the benefit of 2 more years of base period experience with the changed product. The contention is that with 2 additional years following the change in product, it would have sold, not more preheaters, but larger ones and for a greater profit, and that its customers, had they been satisfied 2 years earlier of the practicality and operating efficiency of the larger preheaters, would have ordered such units in the base period. The petitioner has submitted a detailed reconstruction resulting in a CABPNI of $182,841.64 for the taxable year 1940, $356,525.10 for 1941, and $398,409.63 for the years 1942 through 1945.

The petitioner's annual excess profits net income in the base period ranged from about $33,000 to $106,000 with an average of about $66,000. In the taxable years its excess profits net income ranged from about $232,000 to $465,000 with an average of about $400,000.

The change in management which occurred in 1933 has not been shown to constitute a change in character of the business. Except for changes in the vertical preheaters, there is nothing to indicate that the new management adopted specific new policies changing materially the operation or management and resulting in increased earnings. Changes in personnel are insufficient by themselves as a qualification for relief. *Robertson Factories, Inc.*, 31 T.C. 1106 (1959). If the change in preheater construction was due to improvements in boiler design and technology rather than executive decision, the coincidental change in management is not a qualifying factor. And where the change in personnel occurred in September of 1933 it is at least doubtful that such change may be regarded as immediately prior to the base period within the meaning of the statute.

The separate cold end element appears in a catalog published by the petitioner under date of 1932. Apparently it was available at that time if the corrosion problem was involved in any installation. A catalog published in 1939 indicates that the petitioner could furnish a separate cold end element which was easily replaceable if the fuels used had high moisture content. The evidence does not establish that the separate cold end element was a change in product which occurred

during or immediately prior to the base period. Nor is there any indication that it tended to increase earnings.

This issue therefore depends upon whether the changes in rotor drive and support of the vertical preheaters first adopted in 1934 constituted a change in product within the statute. This affected only a part of the petitioner's sales as it did not involve the horizontal preheaters. In the base period the petitioner filled 52 orders for vertical preheaters and 32 orders for the horizontal type for new domestic boiler installations.

If the changes are classed as mere improvements in the product, this does not constitute a difference within the statute. *Avey Drilling Machine Co.*, 16 T.C. 1281 (1951); *Pelton & Crane Co.*, 20 T.C. 967 (1953). The allowance of relief under subsection (b) (4) depends upon whether there is a difference in the character of the business in the base period and the character of the business in the taxable years as a consequence of which the base period earnings are not normal. The nature of the operation must be essentially different after the change and there must be a higher level of earnings directly attributable to the change. The petitioner's advertising in 1939 referred to the changes as "modernization" and indicated that alterations could be made in existing installations to provide center drive and support and two-layer heating surface (separate cold end). The trend toward larger preheaters became pronounced in the early 1930's as a result of technological developments such as the use of pulverized fuel which became common in the mid-1930's. The use of pulverized coal materially reduced the likelihood of preheater corrosion and required more highly preheated combustion air. Also the use of alloy steels materially increased boiler temperature and pressure capabilities. As a result of these and other developments the trend toward larger turbines and boilers was accelerated. The demand for larger air preheaters and highly preheated air was a direct consequence of this marked increase in boiler size and capacity.

The demand for larger preheaters with correspondingly heavier rotors placed a severe strain on the carrying rollers employed to support the vertical preheater rotor at the periphery. The petitioner's engineering department apparently recognized that peripheral rotor support was not satisfactory. A center rotor support design drawing was prepared in 1931, but was not then adopted. In 1934, after receipt of complaints indicating that excessive wear occurred on the carrying rollers of vertical preheaters, the new management determined to construct a center support and drive rotor to meet this problem. This is a normal way in which any manufacturer proceeds to improve its product, meet competition, and survive in business.

The center supported and center driven rotors in the newer model performed the same function as the rim supported type but in a better and more efficient manner. They required less maintenance or replacements. The change did not affect the class of customers or the method of distribution. The manufacturing operation was not essentially different. The higher level of earnings which followed in the taxable years was a normal consequence of an improved product, not of a new and different one.

We have examined the following cases cited by the petitioner and believe they are distinguishable. *Crane Mills*, 35 T.C. 580 (1961); *Charis Corporation*, 22 T.C. 191 (1954); *7-Up Fort Worth Co.*, 8 T.C. 52 (1947); *Bardons & Oliver, Inc.*, 25 T.C. 504 (1955). We appreciate the difficulty of proving a change in product as distinguished from an improvement, but the petitioner has not convincingly established that it changed its product in the present case.

It is clear that petitioner's adoption of center rotor support and drive came in its effort to modernize its vertical preheater to meet changing consumer requirements. The trend toward larger preheaters was a consequence of improvements in boiler design and use of fuels. With larger boiler installations larger preheaters or more preheaters became essential. If the petitioner could not provide preheaters which would do the job, its competitors would supply other types. The petitioner found it necessary to improve its product to meet this customer demand. This improvement does not amount to a change in product within the statute. We are unable to find that this was a change in the product within the scope of section 722(b) (4).

The petitioner in an amended petition filed November 8, 1960, alleges that the respondent erred in failing to increase excess profits net income, or constructive excess profits net income, for 1937 by failing to disallow abnormal deductions for management fees, or for management fees and officers' salaries combined, under the provisions of section 711(b) (1) (J) (ii) of the 1939 Code. The respondent contends that no timely claims for refund based on provisions of section 711(b) were filed and therefore any refund or credit based upon such provisions is barred by the statutory period of limitations, section 322(b). The petitioner argues that where a timely petition was filed under section 732(a) in answer to a notice of disallowance of a claim under section 722 for relief, all taxes imposed under subchapter E of chapter 2 of the 1939 Code are before the Court and that in a proceeding to redetermine the tax under such subchapter all factors entering into its determination are to be considered.

In *Dixie Portland Flour Co.*, 31 T.C. 641 (1958), we decided the case on the merits, bypassing a controversial jurisdictional issue. Since we are persuaded that the abnormality question raised by the peti-

tioner here is without substantial merit, we prefer to dispose of this issue upon that ground.

Section 711 (b) (1) [2] defines the excess profits net income for taxable years in the base period and provides for certain specified adjustments. Subparagraph (J) authorizes an adjustment in the case of deductions which are abnormal for the taxpayer as to class, or excessive in amount. Subparagraph (K) provides rules for application of (J). The petitioner contends that under this provision it is entitled to eliminate abnormal management fees paid during the base period, that these fees are a separate class of expense under (J) and the abnormality is within the rules provided under (K) in that it is not a consequence of an increase in gross income in the base period, a decrease in the amount of some other deduction in the base period, nor a change in the type, manner of operation, size, or condition of the petitioner's business.

Pursuant to the agreement made in 1933, the petitioner paid certain management fees to Superheater. In 1940 the petitioner took over some of the management duties and the liability for such fees was decreased. The petitioner argues that the management fees paid in the base period years were abnormal as to class and should be disallowed under subparagraph (J). The management fee was paid to cover several types of services rendered the petitioner by the corporation which was its principal stockholder. These included managerial services, sales expense other than commissions, and publicity expense. The petitioner was to bear the cost of commissions, engineering, development and experimental work, plant operations

---

[2] SEC. 711. EXCESS PROFITS NET INCOME.

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13(a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14(a) of the applicable revenue law. In either case the following adjustments shall be made * * *:

* * * * * * *

(J) Abnormal Deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

(K) Rules for Application of Subparagraphs (H), (I), and (J).—For the purposes of subparagraphs (H), (I), and (J)—

* * * * * * *

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

and collection, and accounting. The respondent points out that in the base period years the petitioner paid no administrative or engineering salaries, and no travel expense, advertising, or rent, but that in the taxable years when the management fee was reduced it paid salaries in these departments and expenses of these descriptions. If the management fees were abnormal as to class the petitioner has not shown that the abnormality was not a consequence of a decrease in the amount of these other deductions in the base period and under subparagraph (K) they may not be disallowed.

The petitioner next contends that the amount of the fee in 1937 which was greatly in excess of the average of the preceding 4 years was abnormal in amount and should be disallowed to the extent of $120,000 for each of the taxable years.

The respondent contends that the increase in 1937 of the management fee was the consequence of increased gross income. The argument is that the fee varied roughly in proportion to sales and the sales volume in 1937 was substantially larger than theretofore.

The petitioner contends that the fee was not related to the total sales, but was in part a minimum flat amount and in part based upon a segment of sales. The fee was arrived at by negotiation. In March 1937 the fee arrangement was modified by terminating the flat fee of $35,000 per year effective in 1935 and 1936. In September 1937 a minimum fee of $65,000, with modifications, was provided for.

The issue is whether the excessive portion of the management fee paid for 1937 was a consequence of an increase in the petitioner's gross income in the base period. It is clear that the fee was based in part upon a segment of sales, as the petitioner admits, and that the sales were unusually large in that year and the abnormal size of the fee was a result of the increase in gross income in that year. Under subparagraph (K), the abnormality may not be disallowed.

Reviewed by the Special Division as to section 722 issues.

*Decision will be entered for the respondent.*